**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 17, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

INITIATIVE AND REFERENDUM
INSTITUTE; HUMANE SOCIETY OF
THE UNITED STATES; FUND FOR
THE ANIMALS; DAVID M. JONES,
Utah State House Representative;
BART GRANT; LYNETTE E.
BROOKS; CRAIG S. AXFORD;
CONNIE BULLIS; DICK CARTER;
DREW CHAMBERLAIN; BETTY F.
CHRISTENSEN; HIGH UINTAS
PRESERVATION COUNCIL;
HUMANE SOCIETY OF UTAH;
SEAN KEARNEY; CHARLES
CHRISTIAN LARSEN; NANCY
ELLEN WHITEHEAD LORD;
MICHAEL T. RIDGWAY; UTAH
ENVIRONMENTAL CONGRESS;
RICHARD VANWAGENEN;
RICHARD WARNICK; STACY
WILLIAMS,

       Plaintiffs - Appellants/Cross-
       Appellees,

v.

OLENE S. WALKER, Lieutenant
Governor of Utah; MARK
SHURTLEFF, Attorney General of
Utah,

       Defendants - Appellees/Cross-
       Appellants,

and

Nos. 02-4105, 02-4123

UTAH WILDLIFE FEDERATION; UTAH FOUNDATION FOR NORTH AMERICAN WILD SHEEP; SPORTSMEN FOR FISH AND WILDLIFE/SPORTSMEN FOR HABITAT; UTAH FARM BUREAU FEDERATION; UTAH BOWMAN'S ASSOCIATION; REPRESENTATIVE MIKE STYLER; PROFESSOR HAL L. BLACK; PROFESSOR TERRY MESSMER; MS. CINDY LABRUM; MR. KEN JONES; MR. KARL MALONE; DR. CHARLES C. EDWARDS,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:00-CV-00836)**

---

Lisa Watts Baskin (Robert R. Wallace with her on the briefs), of Plant, Wallace, Christensen & Kanell, Salt Lake City, Utah, for Plaintiffs-Appellants/Cross-Appellees.

Thom D. Roberts, Assistant Attorney General (Mark L. Shurtleff, Attorney General, with him on the briefs), Salt Lake City, Utah, for Defendants-Appellees/Cross-Appellants.

Richard G. Wilkins, J. Reuben Clark Law School, Brigham Young University, Provo, Utah, John D. Ray, Jennifer E. Decker, and Matthew B. Hutchinson of Fabian & Clendenin, Salt Lake City, Utah, filed an amici curiae brief for the Utah Wildlife Federation, et al., in Support of Defendants-Appellees/Cross-Appellants.

Before **TACHA**, Chief Circuit Judge, **EBEL**, **KELLY**, **HENRY**, **BRISCOE**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **McCONNELL**, and **TYMKOVICH**, Circuit Judges.

**McCONNELL**, Circuit Judge.

The Utah Constitution allows voters to initiate legislation "to be submitted to the people for adoption upon a majority vote of those voting on the legislation." Utah Const. art. VI, § 1(2)(a)(i)(A). Initiatives related to wildlife management, however, are subject to a special standard: "legislation initiated to allow, limit, or prohibit the taking of wildlife or the season for or method of taking wildlife shall be adopted upon approval of two-thirds of those voting." *Id.* art. VI, § 1(2)(a)(ii). The Plaintiffs, including six wildlife and animal advocacy groups, several state legislators and politicians, and more than a dozen individuals, bring a facial First Amendment challenge to this supermajority requirement. Their principal claim is that by raising the bar for wildlife initiatives, the provision imposes a "chilling effect" on the exercise of their First Amendment rights, and does so in a manner that is both impermissibly content-discriminatory and overbroad. The district court held that the Plaintiffs had standing to raise their challenge, but dismissed their First Amendment claim on the merits. While this case was on appeal, the Plaintiffs' position gained support from another Circuit. In *Wirzburger v. Galvin*, 412 F.3d 271, 279 (1st Cir. 2005),

- 3 -

the Court of Appeals for the First Circuit held that a state constitutional provision prohibiting ballot initiatives on a particular subject constitutes a restriction on speech subject to intermediate scrutiny.

We affirm the district court in both respects. We hold that some of the Plaintiffs have standing to challenge Utah's supermajority requirement for wildlife initiatives and that the case is ripe and otherwise justiciable. Respectfully disagreeing with the First Circuit, we hold that a constitutional provision imposing a supermajority requirement for enactment of initiatives on specific topics does not implicate the freedom of speech.

## I. Facts and Procedural History

Since 1900, the Utah Constitution has vested the legislative power of the state not only in the state Senate and House of Representatives but in "the people of the State of Utah." Utah Const. art. VI, § 1(1)(b). The people exercise their legislative power as provided in Article VI, Section 1(2), which grants voters the authority to initiate legislation to be voted up or down by a majority of voters in a general election. *See id.* art. 6, § 1(2)(a)(i)(A). Utah was the second state in the Union to extend the power to initiate legislation to citizens. *See* Thomas E. Cronin, *Direct Democracy: The Politics of Initiative, Referendum, and Recall* 51 (1989). From 1960 to 1998, voters initiated fifteen ballot measures. Two of these won approval at the polls. *See* State of Utah Elections Office, Results of Utah Initiatives and Referendums, 1960-2000,

*at* http://elections.utah.gov/ResultsofUtahInitiativesandReferendums.htm.

None of those initiatives dealt with wildlife management issues, but wildlife and animal rights advocates saw an opportunity to succeed at the ballot box where they had been stymied in the state legislature. In 1991, a group of citizens commissioned a public-opinion survey regarding cougar and bear hunting methods to determine whether a ballot initiative was likely to succeed. Meanwhile, they used the threat of a statewide wildlife initiative as a bargaining tool in negotiations with state officials. In several other Western states, national groups sponsored high-profile animal protection and wildlife initiatives, and believed that they could mount a similar campaign in Utah. According to documents submitted by the Plaintiffs, by 1996 a group called the Cougar Coalition had announced its mission to "advance the cause of predator protection . . . by taking our cause directly to the citizens of Utah by means of an initiative." App. 62. In January 1997, the Humane Society of the United States commenced planning in Salt Lake City for a wildlife initiative in Utah.

In February 1998, two-thirds of the members of both houses of the Utah legislature passed resolutions endorsing an amendment to Article VI, Section 1 of the state constitution:

> [L]egislation initiated to allow, limit, or prohibit the taking of wildlife or the season for or method of taking of wildlife shall be adopted upon approval of two-thirds of those voting.

Utah Const. art. VI, § 1(2)(a)(ii).  The proposed amendment, dubbed "Proposition 5," was slated for a popular vote during the November 1998 general election.  At a meeting of the Utah Constitutional Revision Commission in August 1998, several proponents explained the reasons for their support of Proposition 5.  State Representative Michael Styler praised the performance of existing regional wildlife management councils and "expressed concern that certain groups from outside the state want to manage Utah wildlife practices through initiative petition."  App. 55.  Don Peay, representing a group called Utahns for Wildlife, put it more bluntly, calling Proposition 5 "an effort to preserve Utah's wildlife practices from East Coast Special Interest groups" who planned to press "the Washington DC agenda" through the initiative process.  *Id.*

In the 1998 general election, 56% of voters approved Proposition 5, and the amendment went into effect on January 1, 1999.  Since then, no group or individual has pursued a wildlife initiative in Utah.

The Plaintiffs filed this lawsuit on October 23, 2000, alleging that the supermajority requirement created by Proposition 5 impermissibly burdens the exercise of their First Amendment rights, violates the First Amendment on overbreadth grounds, and violates the Equal Protection Clause of the Fourteenth Amendment.  They also alleged various violations of the Utah Constitution.  The Defendants countered that the Plaintiffs lacked standing to bring their facial

challenge, and that in any case the Plaintiffs' First Amendment claims failed as a matter of law.

The district court held that the Plaintiffs "clearly have standing to bring this suit." *Initiative & Referendum Inst. v. Walker*, 161 F. Supp. 2d 1307, 1309 (D. Utah 2001). It concluded that the Plaintiffs had alleged an "injury in fact," noting that although the Plaintiffs had not participated in a ballot initiative drive since the passage of Proposition 5, they had "demonstrated through a number of affidavits that they have used the initiative process often in the past and are likely to in the future." *Id.* at 1310. A causal connection existed between the claimed injury and the challenged conduct, according to the district court, because "[i]f the Amendment is unconstitutional, then Plaintiffs' injury is directly traceable to the existence of the Amendment." *Id.* The district court also found the Plaintiffs' challenge ripe, holding that under the "relaxed" standards for ripeness in facial challenges under the First Amendment, they had alleged a present injury: a continuing chilling effect on their First Amendment rights, and "higher costs in getting an initiative passed" in the future. *Id.* at 1311–12. It also rejected the Defendants' argument that the case was not ripe for review because the amendment did not in fact have a chilling effect on the Plaintiffs' speech, noting that "it would be inappropriate to dismiss the case on ripeness grounds because one might find that the Free Speech claim is not meritorious." *Id.*

On the merits, however, the district court granted the Defendants' motion to dismiss the Plaintiffs' facial First Amendment claims, concluding that the supermajority requirement did not amount to a "restriction" on speech at all. The rule "makes it more difficult to pass a wildlife initiative," the court noted, "but it does not prohibit people from talking about such issues at all." *Id.* at 1313. The district court disagreed with the Plaintiffs' characterization of the amendment as viewpoint discrimination, finding that "no viewpoint or content is subject to discrimination or occlusion from public discussion," in part because "'people interested in wildlife' or environmentalists are not homogeneous groups and being a member of one of these groups does not suggest that one would have a discre[te] 'viewpoint.'" *Id.* at 1314.

The Plaintiffs agreed to a dismissal without prejudice of their state law and equal protection claims, and on appeal press only their First Amendment challenge. The Defendants cross-appeal the district court's denial of their motion to dismiss on standing and ripeness grounds. A three-judge panel of this Court heard oral argument on September 15, 2003. Because of the importance of the standing and First Amendment issues at stake, however, we set the case for initial en banc review and reheard the case en banc on November 15, 2005.

## II. Standing

Although this Court finds itself more closely divided on the question of standing than on the underlying First Amendment claim, we cannot reach the

merits based on "hypothetical standing," any more than we can exercise hypothetical subject matter jurisdiction. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (rejecting the doctrine of "hypothetical jurisdiction," once embraced by some courts of appeals as a way to avoid difficult jurisdictional questions when the merits could be more easily resolved). We therefore begin by determining whether the Plaintiffs have standing to bring their First Amendment claim.

## A.

The role of federal courts in our democratic society is "properly limited." *Allen v. Wright*, 468 U.S. 737, 750 (1984); *see also Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 476 (1982). Rather than being constituted as free-wheeling enforcers of the Constitution and laws, the federal courts were limited to what James Madison called "cases of a Judiciary Nature," 2 The Records of the Federal Convention of 1787, at 430 (Max Farrand ed., 1911), and Article III of the Constitution calls "cases" and "controversies." U.S. Const. art. III, § 2. Concern for this limited judicial role is reflected in the principle that, for a federal court to exercise jurisdiction under Article III, plaintiffs must allege (and ultimately prove) that they have suffered an "injury in fact," that the injury is fairly traceable to the challenged action of the Defendants, and that it is redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Particularly important, for present

purposes, is the requirement of an "injury in fact," which the Supreme Court has defined as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotation marks, citations, and footnote omitted). "Allegations of possible future injury" do not satisfy the injury in fact requirement, *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990), though a plaintiff need not "expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). For purposes of the standing inquiry, the question is not whether the alleged injury rises to the level of a constitutional violation. That is the issue on the merits. For standing purposes, we ask only if there was an injury in fact, caused by the challenged action and redressable in court.

The injury alleged by the Plaintiffs in this case is a chilling effect on their speech in support of wildlife initiatives in Utah. This Court has recognized that a chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it "arise[s] from an objectively justified fear of real consequences." *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004); *see Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003); *Wilson v. Stocker*, 819 F.2d 943, 946 (10th Cir. 1987). Although mere "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm," *Laird v. Tatum*, 408 U.S. 1,

13–14 (1972), plaintiffs may bring suits for prospective relief in First Amendment cases where they can demonstrate "a credible threat of prosecution or other consequences flowing from the statute's enforcement." *D.L.S.*, 374 F.3d at 975.

Line-drawing in standing cases is rarely easy, but where the plaintiff's alleged injury is a chilling effect on the freedom of speech, the standing inquiry is particularly delicate. By definition, the injury is inchoate: because speech is chilled, it has not yet occurred and might never occur, yet the government may have taken no formal enforcement action. We cannot ignore such harms just because there has been no need for the iron fist to slip its velvet glove. On the other hand, in speech cases as in others, courts must not intervene in the processes of government in the absence of a sufficiently "concrete and particularized" injury. *Lujan*, 504 U.S. at 560; *see also Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1255 (10th Cir. 2004); *Ward*, 321 F.3d at 1266–67.

Most cases involving standing based on a First Amendment chilling effect arise in the context of criminal laws prohibiting various forms of speech or expressive conduct. *See, e.g.*, *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Winsness v. Yocom*, 433 F.3d 727, 736 (10th Cir. 2006). Most often, those cases involve a past arrest or other enforcement action, a declaration by the plaintiff of an intention to engage in the prohibited conduct again in the future, and evidence of a "credible threat" of prosecution if they do.

*See, e.g.*, *Wilson*, 819 F.2d at 746 (upholding standing and finding a credible threat of future prosecution where the plaintiff had been arrested in the past for violating the challenged statute and "presented sworn testimony that he wishes to continue the conduct which precipitated his arrest, but has not done so for fear of rearrest").

This case does not involve a criminal statute or the threat of prosecution, but rather a provision of the state constitution determining the number of votes required for a citizen initiative to become law. The question is whether the Plaintiffs face a "credible threat" of "real consequences" from enforcement of the supermajority requirement. *D.L.S.*, 374 F.3d at 975. The Defendants acknowledge that a plaintiff need not actually risk arrest, prosecution, or other adverse consequences to obtain standing. They insist, however, that Article III requires that a plaintiff have specific plans to take actions subject to the statute. There must be a "currently pending" initiative proposal involving wildlife management issues, or at least the Plaintiffs must have a "specific or immediate intent to bring any such initiative." Br. of Appellees 25. If not, "it is too speculative and conjectural to evaluate the fitness of the claims for judicial resolution." *Id.* at 26.

That cannot be right. A plaintiff who alleges a chilling effect asserts that the very existence of some statute discourages, or even prevents, the exercise of his First Amendment rights. Such a plaintiff by definition does not—indeed,

- 12 -

should not—have a present intention to engage in that speech at a specific time in the future. It makes no sense to require plaintiffs simultaneously to say "this statute presently chills me from engaging in XYZ speech," and "I have specific plans to engage in XYZ speech next Tuesday." Yet plaintiffs must do more than merely allege a "subjective 'chill.'" *Laird*, 408 U.S. at 13–14. If all it took to summon the jurisdiction of the federal courts were a bare assertion that, as a result of government action, one is discouraged from speaking, there would be little left of the Article III threshold in First Amendment cases.

We hold that plaintiffs in a suit for prospective relief based on a "chilling effect" on speech can satisfy the requirement that their claim of injury be "concrete and particularized" by (1) evidence that in the past they have engaged in the type of speech affected by the challenged government action; (2) affidavits or testimony stating a present desire, though no specific plans, to engage in such speech; and (3) a plausible claim that they presently have no intention to do so *because of* a credible threat that the statute will be enforced. Though evidence of past activities obviously cannot be an indispensable element—people have a right to speak for the first time—such evidence lends concreteness and specificity to the plaintiffs' claims, and avoids the danger that Article III requirements be reduced to the formality of mouthing the right words. If the plaintiffs satisfy these three criteria, it is not necessary to show that they have specific plans or intentions to engage in the type of speech affected by the challenged government

- 13 -

action. *See United Farm Workers*, 442 U.S. at 303 ("[I]t is clear that appellees desire to engage at least in consumer publicity campaigns prohibited by the Act; accordingly, we think their challenge to the precision of the criminal penalty provision, itself, was properly entertained by the District Court . . . ."); *Ward*, 321 F.3d at 1267 (noting that a plaintiff suffers injury in fact when she is "'chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences'" (quoting *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003))). We believe that satisfaction of these three criteria provides roughly the same level of concreteness and particularity that our precedents have demanded in cases involving the threat of criminal prosecution.

This case arises in the procedural context of a motion to dismiss on the pleadings. When evaluating a plaintiff's standing at this stage, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). We also "must construe the statements made in the affidavits in the light most favorable to the petitioner." *D&F Alfonso Realty Trust v. Garvey*, 216 F.3d 1191, 1194 (D.C. Cir. 2000).

**B.**

In one respect, the standing issue in this case is less doubtful than in the typical cases arising from threat of criminal prosecution. In many of those cases, there is serious question whether the challenged statute or ordinance will be

enforced against the plaintiff in the future. *See Winsness*, 433 F.3d at 734 (finding no credible threat of enforcement based on prosecutorial disavowals of any intention to enforce the statute in the future); *D.L.S.*, 374 F.3d at 974–75 (finding no threat of prosecution where the plaintiff had been neither arrested nor charged for violating the challenged statute, prosecutors disavowed any intention to enforce the statute, and the Supreme Court had recently struck down a similar law as unconstitutional); *Faustin v. City & County of Denver*, 268 F.3d 942, 948 (10th Cir. 2001) (finding no "real and immediate threat" of prosecution because of a city prosecutor's determination that the plaintiff's conduct did not violate the challenged statute); *Phelps v. Hamilton*, 122 F.3d 1309, 1327 (10th Cir. 1997) (finding no standing where the plaintiffs failed to demonstrate a credible threat of prosecution under a recently amended statute). In this case, by contrast, the threat of enforcement is not just credible, but certain.

This case is thus poles apart from *Laird v. Tatum*, 408 U.S. at 2, on which the Defendants rely. In *Laird*, citizens filed suit to enjoin the Army from collecting information about domestic political activities that posed a risk of civil disorder. The plaintiffs alleged that the information gathering alone, without any enforcement or other action against the plaintiffs, chilled the exercise of their First Amendment rights because of their "fear that, armed with the fruit of those activities, the agency might in the future take some other and additional action detrimental to [them]." *Id.* at 11. The claim piled speculation upon speculation:

the Army *might* collect information about the plaintiffs, it *might* take some future action based on that information, and that action *might* injure the plaintiffs. Although the Court "fully recognize[d] that governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights," it held that the plaintiffs lacked standing, characterizing the claim as a "subjective chill" because they had no objective basis to believe they faced a specific present or imminent harm. *Id.* at 12–13.

There is no occasion in this case for speculation about prosecutorial discretion, or whether the law will be enforced against the Plaintiffs. If anyone, Plaintiffs included, mounts an initiative campaign involving wildlife management, the initiative will be subject to the two-thirds requirement, and any attendant effects on the freedom of speech will be felt. The difficult question, therefore, is not whether there is a "credible threat of enforcement," but whether those effects on free speech constitute "injury in fact."

## C.

The Plaintiffs in this case have done far more than merely allege a "subjective 'chill.'" *Laird*, 408 U.S. at 13–14. Their past and current conduct in preparation or support for such initiatives in Utah and surrounding states, their allegations regarding their desire to use the initiative process (but for the effect of Proposition 5), and their claims that the supermajority requirement is the reason they are not currently pursuing initiatives provide sufficiently concrete

manifestations of desire to pursue a wildlife initiative to survive dismissal at this stage of the litigation.[1]

First, their past conduct in preparation or support for wildlife initiatives provides concrete support for the inference that Plaintiffs would pursue similar initiatives in the future, if it were not for the supermajority requirement. The Animal Legal Defense Fund, which boasts 503 affiliated members in Utah, states that it "accomplishes its purposes primarily through the initiative process and litigation." Am. Compl. ¶ 7, App. 77. Plaintiff Lynette Brooks helped to commission a public opinion survey of Utah voters on cougar and bear hunting methods, designed in part "to gage [sic] the chance of success of a ballot initiative." App. 189. Although she alleges no specific plans to pursue a future initiative, she explains in her affidavit that this is "because the supermajority requirement makes my efforts futile" *Id.* at 190.[2] Similarly, the Fund for the Animals, a Plaintiff organization, has already brought animal protection initiatives in other states, including Arizona, California, Colorado, Idaho,

_____

[1]Some of the Plaintiffs express no interest in a wildlife initiative, but merely oppose the supermajority requirement in principle. These Plaintiffs do not have standing because their speech is not affected.

[2]To be sure, Ms. Brooks and her organization did not mount an initiative campaign during the three general elections between conducting the survey and enactment of Proposition 5, from which the factfinder could infer that she had other reasons, apart from Proposition 5, for not pursuing an initiative. But at this stage of the litigation, our obligation is to draw all inferences in favor of the plaintiff, not to ask whether contrary inferences would also be reasonable.

- 17 -

Montana, Oregon, and Washington. *Id.* at 211. A factfinder could reasonably infer, based on this pattern of bringing wildlife initiatives in Western states including three of Utah's neighbors, a present desire to bring similar initiatives in Utah.

It is clear that these individuals and organizations have far more than an abstract interest in whether Utah's supermajority requirement is constitutionally valid; they are precisely the type of party most affected by Proposition 5. Indeed, Proposition 5 was avowedly designed to thwart wildlife legislation favored by "local animal extremists" and "East Coast special interest groups"—a recognizable, albeit pejorative, description of some of our Plaintiffs. App. 62; Appellants' Opening Br. 22. During the campaign for Proposition 5, supporters of the supermajority requirement explicitly mentioned one Plaintiff, the Humane Society of the United States, as an organization whose planned initiative should be obstructed. App. 62. It would be peculiar to hold, now, that such plaintiffs are not affected. *See Raines v. Byrd*, 521 U.S. 811, 818 (1997) (explaining that the standing inquiry "focuses on whether the plaintiff is the proper party to bring this suit").

Second, the Complaint and affidavits make clear that the Plaintiffs have the desire to mount wildlife management initiative campaigns in Utah. These statements and allegations necessarily fall short of specific plans. Plaintiffs do not tell us precisely what initiatives they would bring, or when; nor do they claim

any certainty about their intentions. For reasons stated above, however, that is not surprising. The Fund for the Animals, which has 500 members in Utah, brings this suit on behalf of "those individuals of the Fund who wish to pursue any initiative efforts in Utah." Am. Compl. ¶ 6, App. 76–77. According to Plaintiff Dick Carter, "[t]he potential utilization of the initiative power has been contemplated in the past, at present, and in the future." App. 194. Plaintiff Craig Axford has stated, "I foresee myself (or my organization) potentially exercising the right to initiate or participate in an initiative drive regarding wildlife management in Utah should I deem it necessary." *Id.* at 185. The Utah Environmental Congress, another Plaintiff, "may decide to initiate a wildlife ballot initiative that Proposition 5 would harm." *Id.* at 224. Two of the Plaintiffs emphasize that they would like to use the threat of a viable initiative effort as a "bargaining tool" in negotiations with wildlife officials. *Id.* at 189. At least at this stage in the litigation when we must construe the affidavits in the light most favorable to the Plaintiffs, these statements demonstrate that the Plaintiffs—individuals and groups with a long history of wildlife advocacy—are seriously considering mounting a wildlife management initiative but are discouraged from doing so.

Third, the Plaintiffs' affidavits consistently point to the existence of the supermajority requirement as the *reason* they presently have no specific plans to bring a wildlife initiative in Utah. As already noted, Ms. Brooks maintains that,

at present, she "will not attempt to initiate legislation to impose sound wildlife management practices *because the supermajority requirement makes my efforts futile*." *Id.* at 190 (emphasis added). Likewise, according to its President, M. Dane Waters, the Initiative and Referendum Institute "will not undertake any campaign pertaining to wildlife measures [in Utah] *because of the strong likelihood that such an effort would fail*." *Id.* at 234 (emphasis added). Members of the Fund for the Animals "who live in Utah and wish to exercise their First Amendment rights . . . *will be hindered* . . . by the excessive burden on passing a wildlife protection initiative in Utah." *Id.* at 211 (emphasis added). And Mr. Carter attests that "the prohibitive language of [the supermajority requirement] is so broad as to *cause* advocates to steer clear of wildlife advocacy . . . to avoid futile attempts and failed outcomes." *Id.* at 194 (emphasis added).

Taken together, these affidavits establish that the plaintiffs have more than an abstract or speculative interest in the outcome of this litigation. They are actively involved in wildlife advocacy, have prepared or supported wildlife initiatives in the past and in other states, and allege a present desire to use the initiative process to advance their objectives. Moreover, the affidavits establish that the Plaintiffs have been discouraged by the supermajority requirement from making specific plans to introduce an initiative in the future. Coupled with the lack of any doubt that the two-thirds threshold will be enforced, the Plaintiffs

- 20 -

have sufficiently alleged an injury in fact to withstand dismissal of their complaint.

**D.**

The Defendants also argue that the Plaintiffs have not alleged the invasion of a "legally protected interest," which they say is necessary to have standing to sue. They note that the First Amendment "does not guarantee political success" or imply a right to be heard and supported, and that the supermajority requirement "places no direct restriction on the speech of anyone" and leaves the Plaintiffs "free to engage in full and robust political speech." Br. of Appellees 24–25. This approach to the issue, however, confuses standing with the merits.

For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing. Take, for example, *Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam). (We could use any unsuccessful constitutional claim to illustrate the point.) The *Buckley* Court held, in effect, that there is no First Amendment right to make unlimited campaign contributions. *See id.* at 29. Under the Defendants' theory, one might say that a would-be campaign benefactor has no "legally protected interest" in making unlimited contributions, and thus that the Supreme Court should have tossed the case on standing grounds. But that would put the merits cart before the standing horse. *See McConnell v. FEC*, 540 U.S. 93, 227 (2003) ("'[S]tanding in

- 21 -

no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . .'" (quoting *Warth*, 422 U.S. at 500)); *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 & n. 1 (1970) (warning against use of a "'legal interest' test" for standing purposes, on the ground that it "goes to the merits"); *City of Waukesha v. Envtl. Prot. Agency*, 320 F.3d 228, 235 (D.C. Cir. 2003) ("[I]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims."). The First Amendment claim in this case differs from that in *Buckley* only because it is more far-fetched. But its far-fetchedness is a question to be determined on the merits. For purposes of standing, we must assume the Plaintiffs' claim has legal validity. *See Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1256 (10th Cir. 2004) (holding that "[i]f [the plaintiff] is correct on the merits . . . . [t]he injury may have been small . . . but it was not 'speculative'").

The appeal of the Defendants' argument is that the term "legally protected interest" must do some work in the standing analysis.[3] We believe, however, that

---

[3]The Wright & Miller treatise criticizes the phrase "legally protected interest" on the ground that it seems to beg the question of the legal validity of the claim and therefore "provide[s] ample opportunity for mischief" given "the common tendency to use standing concepts to address the question whether the plaintiff has stated a claim." 13 Wright, Miller, Cooper & Freer, *Federal Practice and Procedure* § 3531.4, at 830 (2d ed. Supp. 2005). We believe this "mischief" can and should be avoided.

this term has independent force and meaning, without any need to open the door to merits considerations at the jurisdictional stage.  For example, a person complaining that government action will make his criminal activity more difficult lacks standing because his interest is not "legally protected." *See* 13 Wright, Miller, Cooper & Freer, *Federal Practice and Procedure* § 3531.4, at 830 (2d ed. Supp. 2005).  A person suing to require enforcement of the law against his neighbor lacks standing, even if he is adversely affected by his neighbor's conduct, because no one has a legally protected interest in the prosecution of another.  *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973).  Finally, a plaintiff whose claimed legal right is so preposterous as to be legally frivolous may lack standing on the ground that the right is not "legally protected."  *See Info. Handling Servs., Inc. v. Defendant Automated Printing Servs.*, 338 F.3d 1024, 1030 (D.C. Cir. 2003) (noting that, on a motion to dismiss, "a plaintiff's *non-frivolous* contention regarding the meaning of a statute must be taken as correct for purposes of standing," lest the court "effectively be deciding the merits under the guise of determining the plaintiff's standing" (emphasis added)).  But where the plaintiff presents a nonfrivolous legal challenge, alleging an injury to a protected right such as free speech, the federal courts may not dismiss for lack of standing on the theory that the underlying interest is not legally protected.

In making their "legally protected interest" argument, the Defendants rely on *Skrzypczak v. Kauger*, 92 F.3d 1050 (10th Cir. 1996).  In *Skrzypczak*, the

plaintiff brought a First Amendment challenge to pre-submission screening of ballot initiatives by the Oklahoma Supreme Court. *Id*. at 1052. That court had determined that her proposed anti-abortion law, SQ 642, would violate the United States Constitution and therefore could not appear on the ballot. *Id.* She alleged that the pre-submission screening process chilled the exercise of her First Amendment rights because "she would advocate the passage or defeat of SQ 642 if it were placed on the ballot." *See id.* We found that the plaintiff had "mistakenly conflate[d] her legally-protected interest in free speech with her personal desire to have [the proposed law] on the ballot." *Id.* at 1053. Notwithstanding the pre-submission screening procedure, she remained "free to argue against legalized abortion" and to "speak publicly on any other issue." *Id.* We carefully distinguished *Meyer v. Grant*, 486 U.S. 414 (1988), which is not a standing case but instead dealt with the substantive scope of the First Amendment, on the ground that the Oklahoma Supreme Court had "done nothing to restrict speech: neither Skrzypczak nor anyone else has been silenced by pre-submission content review." *Skrzypczak*, 92 F.3d at 1053. We concluded that "[h]er right to free speech in no way depends on the presence of SQ 642 on the ballot." *Id.*

Rather than dismiss the case for failure to state a First Amendment claim, however, the *Skrzypczak* panel dismissed the case for lack of standing. Raising the standing issue *sua sponte* and without the benefit of briefing on the subject,

*id.* at 1052, we held that because the plaintiff "cites no law, and we find none, establishing a right to have a particular proposition on the ballot," she had "failed to assert a legally-cognizable interest" and therefore could not show an injury in fact, *id.* at 1053.

Tellingly, although this Court has cited *Skrzypczak* several times in subsequent opinions, we have never treated *Skrzypczak* as a standing decision—not even in "chilling effect" cases—and have instead relied on its reasoning in rejecting First Amendment claims on the merits. *See Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1213 (10th Cir. 2002) (discussing *Skrzypczak* in support of the proposition that "no fundamental right has been burdened," but not questioning that the plaintiffs had alleged a "legally protected interest" for purposes of jurisdiction). In rejecting a claim nearly identical to the one advanced by the Plaintiffs in this case, the D.C. Circuit relied on *Skrzypczak* for the proposition that "the First Amendment imposes no restriction on the withdrawal of subject matters from the initiative process." *Marijuana Policy Project v. United States*, 304 F.3d 82, 86 (D.C. Cir. 2002). Other courts universally have treated *Skrzypczak* as a decision on the merits, not a standing case. *See Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 94 P.3d 217, 233 (Utah 2004) (citing *Skrzypczak* in support of the conclusion that the challenged provisions "do not limit free speech and do not violate the First and Fourteenth Amendment free speech guarantees"); *Gallivan v. Walker*, 54 P.3d

- 25 -

1069, 1102 (Utah 2002) (Thorne, J., dissenting) ("The Tenth Circuit dismissed her claim concluding that [Ms. Skrzypczak] did not have a constitutional right to have her initiative placed on the ballot."); *Herrington v. Cuevas*, No. 97 Civ. 5806(SS), 1997 WL 703392, at *8–9 (S.D.N.Y. Nov. 10, 1997) (ordering supplemental briefing and raising questions concerning the analysis of *Skrzypczak* under the heading "Questions Pertaining to the Merits").  Indeed, *Skrzypczak* is cited in the Wright & Miller treatise as an example of "[c]onfusion of merits and standing."  *See* 13 Wright, Miller, Cooper & Freer, *supra*, § 3531.1, at 813 n.13.

We therefore conclude that the *Skrzypczak* panel erred in dismissing the case for want of standing rather than for failure to state a claim under the First Amendment.  In that respect, it is hereby overruled.

The dissenting opinion adopts a variation of the Defendants' argument concerning the need for a "legally protected interest."  According to the dissent, allegations of a chilling effect "frequently" satisfy the injury-in-fact requirement because they are accompanied by the threat of criminal or civil liability.  Op. of Tacha, C.J., at 3–4.  Because the Supreme Court has never reached the merits of a claim asserting "that a government action instills a sense of subjective futility—in the sense that one's speech will not have a desired result"—this *kind* of chilling effect "does not constitute an invasion of a cognizable legal interest."  *Id.* at 11.

Every Court of Appeals to consider this argument has rejected it, reaching the merits of claims virtually identical to those pressed by the Plaintiffs here.  *See*

*Wirzburger v. Galvin*, 412 F.3d 271, 279 (1st Cir. 2005) (reaching the merits where the plaintiffs claimed that a state constitutional provision limiting popular initiatives to certain subjects chilled the exercise of their First Amendment rights); *Marijuana Policy Project*, 304 F.3d at 86 (reaching the merits where the plaintiffs claimed that a federal law giving no legal effect to popular initiatives on certain subjects, including the legalization of drugs, chilled the exercise of their First Amendment rights); *Wellwood v. Johnson*, 172 F.3d 1007, 1008–09 (8th Cir. 1999) (reaching the merits where the plaintiffs claimed that an Arkansas statute requiring the signatures of 30% of the voters on a petition for local-option elections, instead of the usual 15%, chilled the exercise of their First Amendment rights); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 960 (4th Cir. 1992) (reaching the merits of a facial First Amendment challenge to North Carolina's system for electing superior court judges, and holding that although "[t]he First Amendment guarantees the right to participate in the political process," it "does not guarantee political success"); *Washington v. Finlay*, 664 F.2d 913, 927–28 (4th Cir. 1981) (reaching the merits of a facial First Amendment challenge to Columbia, South Carolina's at-large electoral system, and holding that "[t]he carefully guarded right to expression does not carry with it any right to be listened to, believed or supported in one's views"). We think the dissent's approach takes too narrow a view of the "other consequences flowing

from the statute's enforcement" that may serve as the basis for a judicially cognizable injury in fact. *See D.L.S.*, 374 F.3d at 975.

To be sure, "chilling effect" cases most often involve speech deterred by the threat of criminal or civil liability. Yet neither this Court nor the Supreme Court has held that plaintiffs always lack standing when the challenged statute allegedly chills speech in some other way. The clearest example to the contrary is *Meese v. Keene*, 481 U.S. 465, 467 (1987), where the Court entertained a First Amendment challenge to a federal statute that imposed certain registration, filing, and disclosure requirements on agents of foreign principals who disseminate films that the Department of Justice determines meet the statutory definition of "political propaganda." The statute was challenged by a California state senator who wished to exhibit several such films. *Id.* He did not challenge any of the registration requirements (which did not, in any event, pertain to him), but claimed that he was "deterred from exhibiting the films by a statutory characterization of the films as 'political propaganda.'" *Id.* at 473 (internal quotation marks omitted). The Supreme Court noted that enforcement of the statute "does not have a direct effect on the exercise of his First Amendment rights; it does not prevent him from obtaining or exhibiting the films." *Id.* Moreover, the Court held, on the merits, that the plaintiff was not entitled to protection against Congress's use of the term "political propaganda." *Id.* at 480. Nonetheless, the Court held that the alleged injury to the plaintiff—the chilling

effect on his desire to exhibit the films—was a "cognizable injury," and specifically rejected the defendants' argument that the claim constituted only a "subjective chill" within the meaning of *Laird v. Tatum*. *Id.* at 473. Pointing to affidavits submitted by the plaintiff suggesting that exhibiting films officially deemed to be political propaganda would hurt his reputation and his chance for reelection, the Court held that "his situation fits squarely within the[] guidelines" of the Court's standing cases. *Id.* at 472–73.

*Meese* demonstrates that, in some cases, First Amendment plaintiffs can assert standing based on a chilling effect on speech even where the plaintiff is not subject to criminal prosecution, civil liability, regulatory requirements, or other "direct effect[s]," *id.* at 473, and even where, as we know from the Court's decision on the merits, the plaintiff has not asserted any legal interest that is subject to judicial protection. As in this case, the chilling effect on the plaintiff's exercise of First Amendment rights arose entirely because the government's action in labeling the films "political propaganda" made it undesirable for him to exhibit them. To use the language of the Defendants in our case, the "political propaganda" label made exhibition of the films less "effective[]" in advancing his political goals, including winning reelection. *Meese*, 481 U.S. at 472–73; Br. of Appellees 25; *cf.* Op. of Tacha, C.J., at 11 (characterizing the Plaintiffs' claim as reducible to a "sense of subjective futility—in the sense that one's speech will not have a desired result"). In recognizing that the plaintiff in *Meese* had standing,

- 29 -

the Court necessarily rejected the narrow construction of "legally protected interest" that the Defendants and the dissenters seek to impose in this case.

The Supreme Court's decision in *McConnell*, 540 U.S. at 227–28, on which the dissenting opinion relies, *see* Op. of Tacha, C.J., at 5–6, is not to the contrary. There, the Supreme Court held that a group of plaintiffs (the "Adams plaintiffs") that included candidates and their supporters who did not wish to solicit or accept large campaign contributions, lacked standing to challenge the constitutionality of a provision of the Campaign Reform Act that increased hard-money limits and indexed them for inflation. *McConnell*, 540 U.S. at 228. The reason those plaintiffs lacked standing, however, was not that their constitutional claim was wrong on the merits.

First, the Adams plaintiffs claimed that the increase in hard-money limits injured them by "depriv[ing] them of an equal ability to participate in the election process based on their economic status." *Id.* at 227. In holding that they lacked standing to bring this claim, the Court emphasized that a plaintiff must allege the "invasion of a *concrete and particularized* legally protected injury," and that it had "never recognized a legal right comparable to the *broad and diffuse* injury asserted by the Adams plaintiffs." *Id.* (emphases added). The Court distinguished several voting-rights cases in which the injury asserted was the denial of "nondiscriminatory access to the ballot and a single, equal vote for each voter." *Id.* Unlike the voting-rights plaintiffs, the Adams plaintiffs had not

alleged a concrete and particularized individual injury, but had instead alleged a general "curtailment of the scope of their participation in the electoral process." *Id.* Although the Court discussed both the "concrete and particularized" requirement and the "legally protected interest" requirement, without specifying which requirement the Adams plaintiffs failed to satisfy, we read the decision as resting not on the legal deficiency of the claim but on the breadth, generality, and diffuse character of the alleged injury.[4] By contrast, the Plaintiffs in this case have alleged a sufficiently concrete and particularized injury: they have demonstrated that they have previously engaged in the type of speech allegedly chilled by the supermajority requirement, and that they desire to engage in such speech, but that they have no present intention to do so because of the certainty that the supermajority requirement will be enforced.

Second, the Adams plaintiffs claimed that they suffered a "competitive injury" in fundraising against candidates willing to accept larger campaign

---

[4]The dissent criticizes this reading of *McConnell*, arguing the Court's discussion of the Adams plaintiffs' claims rests on the "legally protected interest" requirement, not the requirement of a "concrete and particularized" injury. Op. of Tacha, C.J., at 6. Yet in its quotations from the opinion, the dissent simply omits the language on which we base our contrary reading. *See id.* at 5 (quoting the words "never recognized a legal right comparable," but omitting the words that immediately follow: "to the broad and diffuse injury asserted by the Adams plaintiffs"); *id.* at 6 (quoting the words "[t]his claim of injury by the . . . plaintiffs is . . . not to a legally cognizable right," but omitting the Court's first formulation of the legal standard: "a plaintiff's alleged injury must be an invasion of a concrete and particularized legally protected interest").

contributions. *Id.* at 228. The Court rejected this claim because the injury was not "fairly traceable" to the challenged statute. *Id.* Any indirect effect on the plaintiffs' competitive position was caused not by the law but by "their own personal 'wish' not to solicit or accept large contributions." *Id.* Here, on the other hand, Proposition 5 applies directly to the Plaintiffs' desired activity of seeking to enact wildlife management initiatives, and the personal choices of the Plaintiffs could do nothing to alter that effect.

We recognize that standing doctrine sometimes has a frustratingly metaphysical quality, and the Supreme Court's standing cases do not always seem satisfying or consistent. In this case, however, where the Plaintiff organizations are among the direct targets of a state constitutional change, where there are no doubts about whether the challenged provision will be enforced against them, and where they have submitted satisfactory evidence of the chilling effect on their speech, we join our sister circuits in concluding that this type of claim warrants consideration on the merits.

### E.

The Defendants also assert that the case is not ripe for review. Standing and ripeness are "'closely related in that each focuses on whether the harm asserted has matured sufficiently to warrant judicial intervention.'" *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1234 (10th Cir. 2004) (quoting *Johnson v. Missouri*, 142 F.3d 1087, 1090 n.4 (8th Cir. 1998)). In

evaluating ripeness the "central focus is on 'whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *New Mexicans for Bill Richardson*, 64 F.3d at 1499 (quoting 13A Wright, Miller & Cooper, *Federal Practice and Procedure* § 3532, at 112 (2d ed. 1984)). As the Defendants point out, ripeness doctrine reflects not only limits on the jurisdiction of federal courts under Article III but "important prudential limitations" that may "require us to stay our hand until the issues in [the] case have become more fully developed." *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004).

The ripeness challenge fails here because the Plaintiffs' alleged injury is already occurring. According to the Complaint, the supermajority requirement for wildlife initiatives, by its very existence, chills the exercise of the Plaintiffs' First Amendment rights. The injury is not the defeat of a particular initiative, or even the greater difficulty faced by groups like the Plaintiffs who decide to mount an initiative campaign, but the dampening effect of the supermajority requirement on advocacy of a wildlife initiative. Assuming for the moment that the Plaintiffs' legal theory is correct, their alleged injury does not depend on any uncertain, contingent future events, and the courts would gain nothing by allowing the issues in the case to develop further. Accordingly, the controversy is ripe for adjudication.

- 33 -

## F.

Finally, the Defendants make an argument based on redressability, the requirement that a favorable judgment would meaningfully redress the alleged injury. *Lujan*, 504 U.S. at 568–69. They make a two-pronged attack: even if the supermajority requirement is not struck down, the Plaintiffs could still achieve enactment of a wildlife initiative by winning 70% of the vote, while if it is struck down, there still would be no guarantee of success, because the Plaintiffs "may not be able to generate interest, support, or [passage]" for a wildlife initiative even under a majority rule. Br. of Appellees 26–27. Thus, the Defendants argue in effect, relief in this lawsuit is neither sufficient nor necessary for Plaintiffs to achieve their objectives.

Both versions of the argument misconceive the nature of the Plaintiffs' alleged injury. Plaintiffs' alleged injury is not the difficulty of securing passage of a wildlife initiative, but the chilling effect of the supermajority requirement on their exercise of free speech rights. Whether that is properly framed as a free speech issue is questionable (in the next section, we conclude it is not), but redressability is not in doubt. Declaratory and injunctive relief against the enforcement of the supermajority requirement, if granted, would remove any chilling effect caused by the two-thirds threshold for wildlife initiatives and thereby put a stop to the alleged continuing injury.

Because some of the Plaintiffs have alleged a judicially cognizable injury in fact, ripe for review and redressable through the relief requested, it is not necessary to determine whether other Plaintiffs who have presented the same request for relief have done so. *See Cal. Bankers Ass'n v. Schultz*, 416 U.S. 21, 44–45 (1974); *S. Utah Wilderness Alliance v. Bureau of Land Mgmt.*, 425 F.3d 735, 744 (10th Cir. 2005). We affirm the judgment of the district court denying the Defendants' motion to dismiss for lack of jurisdiction.

### III. The First Amendment Claim

The Plaintiffs contend that Utah's supermajority requirement deters them from exercising their speech rights by making wildlife initiatives less likely to succeed. We consider four alternative variations of the claim: (1) that the supermajority requirement burdens core political speech, and is therefore subject to strict scrutiny; (2) that the requirement burdens expressive conduct, and is therefore subject to intermediate scrutiny; (3) that the requirement discriminates on the basis of content or viewpoint; and (4) that the requirement is overbroad, and must be facially invalidated. We disagree with each variation of the claim, and affirm the district court's conclusion that the supermajority requirement does not implicate the First Amendment at all.

### A.

The Plaintiffs argue most strenuously that the supermajority requirement burdens "core political speech" by making it more difficult to secure passage of a

wildlife initiative.  They therefore ask us to apply strict scrutiny, invalidating the provision unless it is narrowly tailored to serve a compelling state interest.

The First Amendment undoubtedly protects the political speech that typically attends an initiative campaign, just as it does speech intended to influence other political decisions.  In *Meyer v. Grant*, 486 U.S. 414, 416 (1988), for example, the Supreme Court unanimously struck down a Colorado law that made it a felony to pay any person to circulate an initiative petition.  The process of requesting signatures on an initiative petition, the Court reasoned, "of necessity involves both the expression of a desire for political change and a discussion of the merits of the proposed change." *Id.* at 421.  It therefore "involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id.* at 421–22.  Laws that restrict core political speech, the Court held, are subject to "exacting scrutiny"—whether or not they leave citizens "other means to disseminate their ideas." *Id.* at 420, 424.

This Court has struck down other laws regulating the political speech that accompanies an initiative drive. *See Am. Constitutional Law Found., Inc. v. Meyer*, 120 F.3d 1092, 1100–05 (10th Cir. 1997) ("*ACLF*"), *aff'd sub nom. Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999).  The provisions at issue included a requirement that petition circulators be registered voters, a requirement that petition circulators wear a name badge, and certain reporting requirements applicable to proponents of an initiative.  Like the law

invalidated in *Meyer*, these laws specifically regulated the process of advocacy itself: the laws dictated *who* could speak (only volunteer circulators and registered voters) or *how* to go about speaking (with name badges and subsequent reports).

Although the First Amendment protects political speech incident to an initiative campaign, it does not protect the right to make law, by initiative or otherwise. In *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1208 (10th Cir. 2002), we considered a free speech challenge to a Colorado law that allowed the citizens of "home rule" counties to initiate legislation, but did not extend that right to citizens of "statutory" counties. We held that "the right to free speech . . . [is] not implicated by the state's creation of an initiative procedure, but only by the state's attempts to regulate speech *associated with* an initiative procedure." *Id.* at 1211 (emphasis added). Similarly, in *Skrzypczak*, we rejected the argument that the First Amendment prohibits a state from engaging in pre-submission content screening of petitions. *Skrzypczak*, 92 F.3d at 1053 (finding *Meyer* "inapposite," despite the fact that pre-submission screening of an initiative might prevent it from becoming law, because screening "do[es] nothing to restrict speech: neither [the plaintiff] nor anyone else has been silenced"). The distinction is between laws that regulate or restrict the communicative conduct of persons advocating a position in a referendum, which warrant strict scrutiny, and laws that determine the process by which legislation is enacted, which do not.

Other courts have drawn the same distinction. In *Marijuana Policy Project v. United States*, 304 F.3d 82, 84 (D.C. Cir. 2002), the D.C. Circuit considered a First Amendment challenge to a federal law that barred voters in the District of Columbia from passing citizen-initiated legislation that would legalize or reduce the penalties for the possession, use, or distribution of controlled substances, but which permitted initiatives on many other subjects. The court rejected the claim, finding no authority for the suggestion that "limits on legislative authority—as opposed to limits on legislative advocacy—violate the First Amendment." *Id.* at 85. Similarly, the Eighth Circuit in *Wellwood v. Johnson*, 172 F.3d 1007, 1008–09 (8th Cir. 1999), upheld an Arkansas law that required 30% of local voters to sign a petition for a "local-option" ballot initiative (an initiative "to change a county from 'wet' to 'dry' or vice versa"), but required only 15% of voters to sign petitions on other subjects. The court found *Meyer* "inapposite" because the heightened requirements "in no way burden the ability of supporters of local-option elections to make their views heard." *Id.* at 1009 (relying on *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir. 1997), which held that "the difficulty of the [initiative] process alone is insufficient to implicate the First Amendment, as long as the communication of ideas associated with the circulation of petitions is not affected").

The Plaintiffs' argument takes some of the language in *Meyer* out of context. The Court held, for example, that the ban on payment for circulators

restricted political speech because it "limit[ed] the number of voices who will convey [the speakers'] message . . . and, therefore, limit[ed] the size of the audience they can reach." *Meyer*, 486 U.S. at 423. The statute thus had "the inevitable effect of reducing the total quantum of speech on a public issue." *Id.* But there is a crucial difference between a law that has the "inevitable effect" of reducing speech because it restricts or regulates speech, and a law that has the "inevitable effect"of reducing speech because it makes particular speech less likely to succeed. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790 n.5 (1988) (stressing the difference between "a statute regulating how a speaker may speak" and a statute with a "completely incidental impact" on speech, which does not implicate the First Amendment); *Cohen v. Cowles Media Co.*, 501 U.S. 663, 671–72 (1991) (rejecting a challenge to a state court's application of promissory estoppel to a newspaper's promise of anonymity to a confidential source, in part because any effect on First Amendment freedoms was "self-imposed," "no more than incidental, and constitutionally insignificant")*; Ukranian-Am. Bar Ass'n, Inc. v. Baker*, 893 F.2d 1374, 1379 (D.C. Cir. 1990) ("The right to speak protected by the first amendment is not, however, a right to be heeded . . . .").

Under the Plaintiffs' theory, every structural feature of government that makes some political outcomes less likely than others—and thereby discourages some speakers from engaging in protected speech—violates the First Amendment.

Constitutions and rules of procedure routinely make legislation, and thus advocacy, on certain subjects more difficult by requiring a supermajority vote to enact bills on certain subjects. Those who propose, for example, to impeach an official, override a veto, expel a member of the legislature, or ratify a treaty might have to convince two-thirds of the members of one or both houses to vote accordingly. State constitutions attach supermajority requirements to a bewildering array of specific categories of legislation, including appropriations bills, tax levies, bonding bills, debts, land use regulations, the salaries and discipline of state officials, district formation and redistricting, and judicial administration. California imposes a supermajority requirement for approval of gaming compacts. Cal. Gov't Code § 12012.25(b)(2). Hawaii imposes a supermajority requirement to permit the construction of nuclear power plants and the disposal of radioactive material. Haw. Const. art. XI, § 8. Minnesota employs a supermajority requirement to control the enactment of any "general banking law." Minn. Const. art. IV, § 26. Oregon uses the device to make it more difficult to institute reductions in certain criminal sentences. Or. Const. art. IV, § 33. South Carolina requires a supermajority to display unauthorized flags at the state capitol building. S.C. Code Ann. § 10-1-160. These provisions presumably have the "inevitable effect" of reducing the total "quantum of speech" by discouraging advocates of nuclear power plants, general banking laws, or unauthorized state flags from bothering to seek legislation or initiatives

embodying their views.  Yet if it violates the First Amendment to remove certain issues from the vicissitudes of ordinary democratic politics, constitutions themselves are unconstitutional.  Indeed, the Plaintiffs' theory would have the ironic effect of rendering the relief they seek in this litigation unconstitutional under the First Amendment: if it is unconstitutional to amend the Utah constitution to require a supermajority to approve a wildlife initiative, those who favor such an amendment would be less likely to engage in advocacy in its favor.

No doubt the Plaintiffs are sincere in their many sworn statements that they find the heightened threshold for wildlife initiatives dispiriting, and feel "marginalized" or "silenced" in the wake of Proposition 5.  Their constitutional claim begins, however, from a basic misunderstanding.  The First Amendment ensures that all points of view may be heard; it does not ensure that all points of view are equally likely to prevail.

**B.**

We turn next to an alternative theory, which was embraced in a recent decision of the First Circuit: that subject-matter limitations in the initiative process amount to restrictions on expressive conduct, and are therefore subject to intermediate scrutiny.  In *Wirzburger v. Galvin*, 412 F.3d 271 (1st Cir. 2005), the First Circuit considered a First Amendment challenge to provisions of the Massachusetts Constitution that prohibited ballot initiatives on two subjects: initiatives calling for "public financial support for private primary or secondary

- 41 -

schools," and initiatives "'relate[d] to religion, religious practices or religious institutions.'" *Id.* at 274–75 (quoting Mass. Const. amend. art. 18; *id.* art. 48, pt. 2, § 2). The court recognized, as we have, that the "common denominator" in cases striking down laws governing the initiative process was "a direct restriction on the communicative aspect of the political process." *Id.* at 277. It therefore declined to apply strict scrutiny. *Id.*

Instead of finding the First Amendment wholly inapplicable, however, the court applied intermediate scrutiny under *United States v. O'Brien*, 391 U.S. 367 (1968). According to the First Circuit, the Massachusetts Constitution banned "expressive conduct"—the act of bringing an initiative petition—that involved both speech (one-on-one communications) and nonspeech (lawmaking) elements. *Wirzburger*, 412 F.3d at 278–79.[5] The court ultimately upheld the subject-matter exclusions in the state constitution, but only because it found that the government had an important interest "in maintaining the proper balance between promoting free exercise and preventing state establishment of religion," and that the limitations on ballot measures restricted speech no more than necessary to serve that interest. *Id.* at 279. Presumably, other subject-matter restrictions on citizen initiatives would seem less worthy, and would fail to pass intermediate scrutiny.

---

[5]The First Circuit explicitly declined to follow the contrary opinion of the D.C. Circuit in *Marijuana Policy Project*, 304 F.3d 82. We find ourselves in agreement with the D.C. Circuit rather than the First.

Perhaps *Wirzburger* is distinguishable.  The Massachusetts Constitution flatly prohibited initiatives on certain subjects, and thus arguably "restricted" speech more severely than the supermajority requirement in this case.  But this is only a difference in degree. The chilling effect from a total ban may be greater than the chilling effect from a supermajority requirement, but they raise the same First Amendment issue.

In any event, we disagree with *Wirzburger*'s premise that a state constitutional restriction on the permissible subject matter of citizen initiatives implicates the First Amendment in any way.  The intermediate scrutiny standard of *O'Brien* applies to laws that restrict "expressive conduct" such as flag burning, nude dancing, or sitting at a segregated lunch counter.  *See Heideman v. South Salt Lake City*, 348 F.3d 1182, 1192 (10th Cir. 2003).  It does not apply to structural principles of government making some outcomes difficult or impossible to achieve.  Each of the "expressive conduct" cases cited by the First Circuit involved statutes that prohibited expressive conduct, not statutes that made the expression less persuasive or less likely to produce results.  *See O'Brien*, 391 U.S. at 376–77 (criminal penalties for draft card mutilation); *Texas v. Johnson*, 491 U.S. 397 (1989) (criminal penalties for flag burning); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984) (restrictions on camping in national parks).

The First Circuit averred that it could not "see how, given the Supreme Court's analysis in *Meyer*, subject-matter exclusions from a state initiative process 'restrict[] no speech.'" *Wirzburger*, 412 F.3d at 279 (criticizing *Marijuana Policy Project*, 304 F.3d at 85). The court explained that "[t]he communicative power of an initiative stems precisely from the fact that it is not just speech; it is a process that can lead to the creation of new laws or constitutional amendments." *Id.* at 277. It does not follow, however, that constitutional provisions making the enactment of particular types of law more difficult are therefore restrictions of speech. For reasons set forth in the previous section, the problem with protecting the *impact on speech*, instead of simply protecting *speech*, is that no one has a right under the First Amendment to be taken seriously. Like the Plaintiffs' argument for strict scrutiny, the First Circuit's argument for intermediate scrutiny is fundamentally at odds with the idea of constitutional limitations on the democratic process. All such limitations make certain types of advocacy less likely to "lead to the creation of new laws"; it does not follow that all such limitations are challengeable under the First Amendment.

The First Circuit's analysis may appear more appealing, at first, than the Plaintiffs' argument that specific subject matter limitations on the initiative and referendum process are subject to the almost certain invalidation of strict scrutiny. Intermediate scrutiny seems a moderate middle ground. But arguably,

intermediate scrutiny, in this context, would be an especially egregious interference with the authority of "We the People" to adopt constitutional provisions governing the legislative or initiative process. According to the First Circuit, the constitutionality of a provision limiting the initiative process depends on the federal court's assessment of whether a given restriction on the initiative power of the people serves a "substantial governmental interest." *Id.* at 279. That appears to involve an assessment of the virtues and vices of the particular initiatives that are affected by the limitation. In *Wirzburger*, for example, the First Circuit ultimately upheld the challenged limitation on the ground that maintaining the "proper balance" between the establishment and free exercise of religion is important. *Id.* No one knows what the court would think of restrictions involving bond issues, gaming contracts, or unauthorized state flags. The foundation on which our system of written constitutions has been erected is that "*the people* have an original right to establish, for their future government, such principles as, *in their opinion*, shall most conduce to their own happiness." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 176 (1803) (emphasis added). We can imagine few tasks less appropriate to federal courts than deciding which state constitutional limitations serve "important governmental interests" and which do not. On what basis could a federal court conclude that the people are justified in erecting barriers to the adoption of referenda allowing financial aid to private religious schools but not to those involving general banking laws or wildlife

- 45 -

management practices?  Under our form of government, the people and their representatives, and not judges, assume the task of determining which subjects should be insulated from democratic change.

Because the supermajority requirement does not restrict any "expressive conduct," we decline to apply intermediate scrutiny under *O'Brien*.

## C.

The Plaintiffs also challenge Utah's supermajority requirement for wildlife management initiatives as impermissible content discrimination.  Legislation that would "allow, limit, or prohibit the taking of wildlife or the season for or method of taking wildlife," must win the approval of two-thirds of voters, while legislation on any non-wildlife subject need only command a majority.  *See* Utah Const. art. VI, §1(2)(a).  The problem with this argument is that the prohibition on content discrimination only applies to regulations of speech or expression.  As we have already explained, the supermajority requirement at issue here is a regulation of the legislative process, not a regulation of speech or expression.

The Supreme Court has explained that "[t]he principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Rock Against Racism*, 491 U.S. at 791.  In this case, it is hard to tell whether the provision discriminates on the basis of viewpoint, or merely on the basis of subject matter.  The provision applies equally to initiatives to "allow" the taking

of wildlife as to those to "limit" or "prohibit" it. If the Utah wildlife management authorities decided to restrict or prohibit hunting, Proposition 5 would make it difficult for pro-hunting forces to obtain redress through the initiative process. On the other hand, some evidence exists that the provision was targeted at a particular point of view—that of the "East Coast special interests" who supposedly seek to change Utah's animal protection laws. Moreover, the two-thirds threshold works to the advantage of the status quo. Some precedent suggests this may make it viewpoint discriminatory. *See Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 770 (2d Cir. 1999) (finding that a provision "clearly seeks to discourage challenges to the status quo" and therefore "discriminates on the basis of viewpoint"), *aff'd*, 531 U.S. 533 (2001).

Ultimately, whether Proposition 5 discriminates on the basis of viewpoint or subject matter is irrelevant. To qualify as a content-based "regulation of speech," a statute must restrict speech or expressive conduct in the first place. *See Asociación de Educación Privada de P.R., Inc. v. Echevarría-Vargas*, 385 F.3d 81, 84–85 (1st Cir. 2004) (rejecting the plaintiffs' argument that a "consumer protection regulation" requiring disclosure of information about changes in school textbooks amounted to a content-based restriction because it "does not purport to address the content of speech; nor does it purport to regulate speech at all"). Many constitutional provisions, both state and federal, discriminate on the basis of viewpoint without being deemed to violate the First

- 47 -

Amendment. The Cruel and Unusual Punishment Clause, for example, makes it difficult to pass laws resurrecting the use of thumbscrews or ear cropping, but not to pass laws promoting humane prison conditions. Undoubtedly, this favors one viewpoint on punishment and disfavors another. But the Cruel and Unusual Punishment Clause is not a restriction on speech, and need not undergo the rigors of First Amendment scrutiny. Similarly, the supermajority requirement at issue here determines the conditions under which citizen-initiated legislation becomes law. It does not regulate speech or expressive conduct. Whether it discriminates on the basis of viewpoint is therefore beside the point.

**D.**

Finally, the Plaintiffs challenge the supermajority requirement as overbroad, and argue that it "creates a chilling effect on speech and association which is profound, real, and material." Appellants' Opening Br. 39. Quite apart from its effects on wildlife initiatives, the Plaintiffs argue, Proposition 5 has chilled speech in two ways: (1) it has deterred wildlife advocates from *threatening* to launch a petition; and (2) it has cowed proponents of initiatives on *other subjects*, who fear "similarly harsh treatment by the state legislature and the Governor." *Id.* at 41. Thus, the Plaintiffs argue, even if some applications of the requirement are permissible, the statute "reaches a substantial amount of constitutionally protected conduct" and must be invalidated. *Id.* at 40.

The overbreadth doctrine is an exception to the "traditional rule" concerning facial attacks "that 'a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court.'" *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 38 (1999) (quoting *New York v. Ferber*, 458 U.S. 747, 767 (1982)).  In cases involving statutes that "regulate or proscribe speech," this traditional rule is relaxed, because of the risk that people might refrain from exercising their First Amendment rights "for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson*, 405 U.S. 518, 520–21 (1972).

The overbreadth doctrine has no application to this case.  Because the supermajority requirement does not regulate speech, it does not violate the First Amendment rights of persons not before the court.  *See Virginia v. Hicks*, 539 U.S. 113, 118 (2004) (holding that a plaintiff bringing an overbreadth challenge must demonstrate that the statute "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep" (internal quotation marks omitted)). The Plaintiffs' "overbreadth" argument is nothing more than a restatement of the First Amendment argument they make on their own behalf.  Because the supermajority requirement presents no "realistic danger that the statute itself will significantly compromise recognized First Amendment protections," *Members of the City Council of L.A. v. Taxpayers for Vincent*, 466

U.S. 789, 800–01 (1984), the overbreadth doctrine is not applicable. *See United Reporting Publ'g*, 528 U.S. at 40 (refusing to engage in an overbreadth analysis the challenged law was "not an abridgment of anyone's right to engage in speech").

## IV. Conclusion

Because we find each of the Plaintiffs' First Amendment theories flawed as a matter of law, we affirm the decision of the district court dismissing the case for failure to state a claim. The judgment of the district court is **AFFIRMED**.

Nos. 02-4105, 02-4123, *Initiative and Referendum Institute v. Walker*

**TACHA**, Chief Circuit Judge, dissenting.  **EBEL** and **KELLY**, Circuit Judges, joining in the dissent.

I concur in part and dissent in part.  Specifically, I concur with the majority opinion that the supermajority requirement does not violate the First Amendment, but I respectfully dissent with regard to the conclusion that the Plaintiffs have standing to press their First Amendment claims.[1]  To establish an injury in fact for purposes of standing, "a party must first and foremost establish [1] an invasion of a legally protected interest [2] that is concrete, particularized, and [3] actual or imminent." *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 883 (10th Cir. 1997).  In this case, I would hold that the Plaintiffs' alleged injury does not constitute an invasion of a legally protected interest.

As an initial matter, it is highly doubtful that the Plaintiffs have alleged anything more than a "subjective chill."  Nevertheless, the majority holds otherwise because (1) the Plaintiffs' past conduct in preparation for or support of wildlife initiatives supports the inference that they would do so in the future, (2) the evidence suggests a desire to mount wildlife management initiatives campaigns in Utah, and (3) the supermajority voting requirement stands in the way of any specific plans to pursue similar initiatives.  Maj. Op. at 16-21.  Yet

---

[1]Of course, because I conclude that the Plaintiffs do not have standing, reaching the merits is unnecessary to the disposition of this appeal.  Nevertheless, I join Part III of the majority opinion so that the Court may speak more clearly on this important issue.

puzzlingly, not a single Plaintiff has ever brought a wildlife management initiative in Utah, nor has a single Plaintiff elucidated any concrete plans to do so now or in the future. As the majority correctly notes: "Plaintiffs do not tell us precisely what initiatives they would bring, or when; nor do they claim any certainty about their intentions." Maj. Op. at 18-19. Nor do the Plaintiffs even give us so much as an intimation. A future initiative that may or may not be undertaken is precisely the type of conjectural and hypothetical situation that fails to confer standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).[2]

---

[2]None of the evidence suggests actual or imminent injury. General statements from organizations that they accomplish their aims through initiative and legislation, and have done so in other states, say nothing about a present intent to bring similar initiatives in Utah. The fact that one of the Plaintiffs helped to commission a public opinion survey of Utah voters to consider the feasability of a ballot initiative in 1991, seven years before passage of the supermajority requirement, suggests just the opposite—no current plans to pursue such an initiative. The Plaintiffs' statements foreseeing the use of such initiatives (either for substantive purposes or as a bargaining tool) omit the obvious: when, where and for what? Likewise, the statements by various Plaintiffs—that they will not participate in the wildlife initiative process because the supermajority requirement makes it futile—simply lack any semblance of specificity as to any particular actions contemplated.

Although the standing inquiry was resolved on a motion to dismiss, the district court also properly considered affidavits which should have incorporated specific facts supporting standing. *See Warth v. Seldin*, 422 U.S. 490, 502 (1968). The Plaintiffs had the burden of sufficiently alleging facts concerning standing; *Lujan*, 504 U.S. at 561; the facts did not materialize thereby warranting dismissal of the complaint. *See Warth*, 422 U.S. at 502. While the facts must be construed in the light most favorable to the Plaintiffs, we are required to consider only reasonable inferences. In my view, it is unreasonable to conclude that the Plaintiffs have standing because initiatives have been pursued in other states, or

The majority characterizes the Plaintiffs' injury as "a chilling effect on speech in support of wildlife initiatives in Utah." Maj. Op. at 10. But the mere claim of First Amendment "chill" is not, and has never been, sufficient to establish an injury in fact. *See Laird v. Tatum,* 408 U.S. 1, 13–14 (1972) ("Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm."); *Nat'l Student Ass'n v. Hershey*, 412 F.2d 1103, 1113–1114 (D.C. Cir. 1969) ("not . . . every plaintiff who alleges a First Amendment chilling effect and shivers in court has thereby established a case or controversy."). Rather, a "[c]hilling effect is cited as the *reason* why the governmental imposition is invalid rather than the *harm* which entitles the plaintiff to challenge it." *United Presbyterian Church in the U.S.A. v. Reagan*, 738 F.2d 1375, 1378 (D.C. Cir. 1984).

Be that as it may, when confronted with an assertion of First Amendment "chill," we must look to the underlying cause of the "chilling effect" in order to determine whether it constitutes an invasion to a legally protected interest. *See D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2003) (stating that to amount to an injury, the chilling effect "must arise from an objectively justified fear of real consequences"). For example, frequently in "chill" cases, First Amendment activities are stymied by a credible threat of criminal prosecution. *See, e.g.*,

---

because the Plaintiffs hold strong opinions about these issues.

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1229 (10th Cir. 2005); *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003); *Wilson v. Stocker*, 819 F.2d 943, 946–47 (10th Cir. 1987).  Other examples include "chill" that is caused by the threat of civil liability, *see New York Times v. Sullivan*, 376 U.S. 254 (1964), or "chill" that is caused by the threat of damage to personal and professional reputation, *see Meese v. Keene*, 481 U.S. 465, 473 (1987).  These potential harms are all properly recognized as invasions of legally protected interests that give rise to a cognizable claim of First Amendment "chill."

The cause of the Plaintiffs' "chill" in this case, however, is fundamentally different from the aforementioned cases.  Enforcement of the supermajority requirement may diminish the Plaintiffs' ability to pass legislation, but that prospect is not what causes the Plaintiffs' unwillingness to speak.  To the contrary, the cause of this unwillingness is the Plaintiffs' subjective determination that speaking out on wildlife matters is not worth their time and energy unless the line drawn for passing an initiative is precisely where they want it—here, at 50.1% rather than at 66%.[3]   Unlike typical "chill" cases in which the plaintiffs

---

[3]A hypothetical further underscores the nature of the Plaintiffs' injury. Citizens' Organization wishes to use the initiative process to pass Proposition X. Polling reveals Proposition X will only be supported by thirty percent of the population of Utah.  Citizens' Organization claims that the election procedure requiring a simple majority vote for passage "chills" its speech.  Under the majority's approach, this "chill" constitutes an invasion of a legally protected

face a credible threat of real consequences if they choose to engage in the regulated conduct, in this case the "chill" arises only from the Plaintiffs' subjective sense of futility as to the efficacy of their speech.

Indeed, the Supreme Court faced a similar claim of subjectively derived injury in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). The plaintiffs in that case raised an equal protection challenge to an increase in campaign contribution limits. Their claimed injury was that the statute "deprive[d] them of an equal ability to participate in the election process based on their economic status." *Id.* at 227. Turning to the "nature and source of the claim asserted," the Court noted that it had "never recognized a legal right comparable" to the injury allegedly suffered by the plaintiffs. *Id.* It distinguished prior voting-rights cases and called the plaintiffs' reliance on them "misplaced." *Id.* The Court went on to emphasize that "[p]olitical 'free trade' does not necessarily

interest and Citizens' Organization would have standing to challenge the procedure so long as it credibly alleges that it has engaged in the initiative process in the past, states its present desire to bring Proposition X before the voters, and claims that it presently has no intention to do so because of the "credible threat" that the majority requirement will be enforced.

As this example demonstrates, despite Citizens' Organization's claims of First Amendment "chill," the reality is that Citizens' Organization's desire to promote Proposition X is hindered not by the operation of the simple majority requirement, but by its subjective calculation of the economic merits of advancing a cause that may not result in a fulfilling outcome. As in the hypothetical, the majority's conclusion here that the Plaintiffs' alleged "chill" constitutes an injury in fact only makes sense if one accepts the implicit assumption that Plaintiffs' expectation of electoral efficacy is a legally protected interest. This assumption, however, does not find support in the case law.

require that all who participate in the political marketplace do so with exactly equal resources." *Id.* (quoting *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 257 (1986)). Therefore, the Court concluded that "[t]his claim of injury by the . . . plaintiffs is . . . not to a legally cognizable right," and it dismissed the suit for want of standing. *Id.*

Despite this language, the majority asserts that the Court did not specify whether the plaintiffs lacked standing because they failed to allege a "concrete and particularized" injury or because their injury was not to a "legally protected interest." Maj. Op. at 31. It therefore "read[s] the decision as resting not on the legal deficiency of the claim but on the breadth, generality, and diffuse character of the alleged injury." Maj. Op. at 31. I think, however, that the Court said what it meant and meant what it said, and that the Court's holding that the plaintiffs' alleged injury is "not to a legally cognizable right" requires no interpretation.

In part because the majority reads *McConnell* as holding that the plaintiffs failed to allege a concrete and particularized injury, it is able to overrule this Court's decision in *Skrzypczak v. Kauger*, 92 F.3d 1050, 1053 (10th Cir. 1996). Although decided seven years before *McConnell*, *Skrzypczak* undertook the same type of analysis and denied the plaintiff standing when she failed to allege the invasion of a legally protected interest. *Id.* at 1053.

In that case, Ms. Skrzypczak argued that her ability to speak her mind on the issue of abortion was curtailed by the Oklahoma law that subjected initiative

proposals to constitutional review prior to their placement on the ballot. Specifically, after a proposal criminalizing most abortions was found by the Oklahoma Supreme Court to be incompatible with the Constitution and was therefore prohibited from being put to a popular vote, Ms. Skrzypczak challenged the Oklahoma Supreme Court's decision as an impermissible prohibition on speech. Significantly, her claimed injury was based solely on allegations that she would have advocated for the passage or defeat of the proposition had it been placed on the ballot. *Id.* at 1052. Unlike typical initiative regulation cases involving First Amendment claims, Ms. Skrzypczak specifically denied any involvement in the effort to place the initiative on the ballot. She merely alleged that the decision by the Oklahoma Supreme Court constituted a prior restraint on her speech because she wanted to engage in speech activity related to the proposed initiative.

As noted above, we dismissed the suit for lack of standing. We held that Ms. Skrzypczak had not established an injury in fact because her ability to express her opinion was not impaired by the pre-submission review, and therefore, she had failed to allege an injury to a legally protected interest:

> Skrzypczak mistakenly conflates her legally-protected interest in free speech with her personal desire to have SQ 642 on the ballot. In removing SQ 642 from the ballot, the Oklahoma Supreme Court has not prevented Skrzypczak from speaking on any subject. She is free to argue against legalized abortion, to contend that pre-submission content review of initiative petitions is unconstitutional, or to speak publicly on any other issue. Her right to free speech in no way

- 7 -

depends on the presence of SQ 642 on the ballot. Moreover, she cites no law, and we find none, establishing a right to have a particular proposition on the ballot.

*Skrzypczak*, 92 F.3d at 1053.

Although *Skrzypczak* did not say so explicitly, the clear import of that case was that because the source of Ms. Skrzypczak's unwillingness to speak was Ms. Skrzypczak herself rather than the threat of actual consequences if she did in fact speak, she had not alleged any invasion of a legally protected interest. By comparison, standing exists in "chill" cases that involve a double edged-sword where individuals seeking to exercise First Amendment rights face, for example, criminal or civil liability or damage to personal or professional reputation, and therefore must choose between engaging in the regulated speech and suffering the consequences or remaining silent. First Amendment standing jurisprudence recognizes that neither result is desirable.[4] But the law at issue in *Skrzypczak* presented no such choice. Ms. Skrzypczak chose not to speak on abortion not because of a fear of enforcement consequences that might accrue to her if she exercised her right, but rather because she would not find speaking on the issue personally satisfying without a specific initiative on the ballot. That is not sufficient to establish the invasion of a legally protected interest because the law

---

[4]As the majority notes, this insufferable choice is precisely why plaintiffs have standing in "chill" cases despite the presence of only an inchoate injury. See Maj. Op. at 11.

neither guarantees nor protects a plaintiff's interest in personal satisfaction. *Cf.*

*McConnell*, 540 U.S. at 227 (no legally protected interest in competing in the

political marketplace with exactly equal resources); *Linda R.S. v. Richard D.*, 410

U.S. 614, 619 (1973) (no legally protected interest in the prosecution of another);

*see also United Presbyterian Church*, 738 F.2d at 1378 (stating that "[a]ll of the

Supreme Court cases employing the concept of 'chilling effect' involve situations

in which the plaintiff has unquestionably suffered some concrete harm . . . *apart*

*from the 'chill' itself*.") (emphasis added).[5]

The majority now overrules *Skrzypczak*, arguing that the question cannot be

whether the defendants' action violates the Constitution because "[i]f that were

the test, every losing claim would be dismissed for want of standing."[6]  Maj. Op.

_____

[5]The majority cites to a host of cases in which Courts of Appeals have
reached the merits of similar inquiries after "consider[ing] this argument" and
"reject[ing] it."  Maj. Op. at 26-27.  With respect, I note that all the cases cited by
the majority passed on the standing question *sub silencio*, and the courts are
therefore not bound by their implicit resolution of the issue.  *Cf. Pennhurst State
Sch. & Hosp. v. Halderman*, 465 U.S. 89, 119 (1984) (a court is not bound by
jurisdictional issues not addressed in prior opinions).

[6]I agree with the majority's observation that simply because a claim is
novel or without precedent, a court may not dismiss the claim for lack of
standing.  The minimal constitutional requirement that a claim arise from an
invasion of a legally protected interest, however, does not prejudge the merits of
the claim.  In this way, I disagree with the majority's assertion that "this case
differs from that in *Buckley* [*v. Valeo,* 424 U.S. 1 (1976) (per curiam),] only
because it is more far-fetched."  Maj. Op. at 22.  To begin, there is no question
that the plaintiffs in *Buckley* alleged an injury that invaded a legally protected
interest.  The prospect of criminal penalties for making illegal campaign
contributions is clearly an injury to an interest that the law recognizes.  But the
question at issue here is not the relative novelty of the Plaintiffs' claims as to the

at 21.  As discussed above, this argument misses the reasoning behind *Skrzypczak*. Again, although the Court in *Skrzypczak* discussed whether the Oklahoma law prohibited speech, the real focus of the case was on the consequences (or lack thereof) that would befall Ms. Skrzypczak is she exercised her First Amendment rights: We concluded that Ms. Skrzypczak had not alleged a legally protected interest because unlike a plaintiff who alleges a fear of prosecution or other enforcement consequences that might directly accrue to the plaintiff due to the operation of the challenged law, the source of Ms. Skrzypczak's alleged "chill" was her own subjective determination as to the efficacy of her speech.  *Cf. McConnell*, 540 U.S. at 227 (no legally cognizable right for those "who participate in the political marketplace [to] do so with exactly equal resources."). Accordingly, I respectfully dissent with regard to the conclusion that *Skrzypczak* should be overruled.[7]

Because I do not agree that *Skrzypczak* was wrongly decided, I believe that it controls the outcome of this case.  The Plaintiffs' averment that "political speech is lessened by the supermajority requirement," may be true, but it is only as a result of the Plaintiffs' internal perception of the difficulty they face in

---

scope of the protection afforded by the First Amendment, but, rather, whether or not the Plaintiffs' claimed injury invades a legally protected interest at all.

[7]I also note that no party to this dispute asked this Court to review its decision in *Skrzypczak*, no party questioned its continuing validity, and the resolution of the issue does not affect the outcome of the case before us.

achieving a self-defined measure of political success. An assertion that a government action instills a sense of subjective futility—in the sense that one's speech will not have a desired result—does not constitute an invasion of a cognizable legal interest. I respectfully dissent with the majority's conclusion that the Plaintiffs have standing.

Nos. 02-4105, 02-4123; Initiative and Referendum Institute v. Walker

**LUCERO**, Circuit Judge, concurring in part and dissenting in part.

I am pleased to join Parts I & II of Judge McConnell's opinion on the issues of standing and ripeness. I cannot, however, join the conclusion of my respected colleagues as to the merits, as expressed in Part III. Because today's decision frees from constitutional scrutiny conduct by a majority of voters that has the potential to chill political speech on the basis of content by imposing discriminatory election requirements; because the decision falls on the wrong side of a circuit split; and because the decision offends traditional notions of governance by the people, I respectfully dissent.

Assuredly, a state may adopt a constitutional amendment barring the passage of any law affecting an issue. But it may not rig election laws by imposing a content-based two-thirds majority requirement – or greater, as today's decision would allow – without implicating the First Amendment and subjecting such conduct to judicial review. Because participating in an election and engaging in election-related speech are effectively part of the same course of conduct, election laws that discriminate against a minority's views implicate fundamental rights enshrined in the First Amendment.

The constitutional amendment at issue, "the Wildlife Amendment," passed by a bare majority of Utah voters, provides that initiatives "to allow, limit, or prohibit the taking of wildlife or the season for or method of taking wildlife shall be adopted upon approval of two-thirds of those voting." Utah Const. art. VI,

§ 1(2)(a)(ii).  Those favoring the status quo on wildlife issues were able to pass this amendment because they are, at least as of the time of passage, a majority of Utah voters.  By passing this constitutional amendment, the current majority has enshrined its present views into perpetuity.  Now, regardless of whether a future majority – even a 66% majority – of the population supports a change in wildlife laws, such future majority will be unable to use the initiative process to enact its preferences into law.  Further, the two-thirds requirement will chill any attempt to change the law, as any such campaign will be futile.  As stated in a report prepared by the Utah Division of Wildlife Resources, the amendment "make[s] it virtually impossible for the citizens of Utah to mount a successful ballot initiative affecting wildlife management practices."  One scholar has described this as a problem of "intertemporal entrenchment."  Michael Klarman, Majoritarian Judicial Review, 85 Geo. L.J. 491, 517 (1997).

What we confront in this case is substantively indistinct from what occurs when a political party currently in power draws district lines for legislative seats to their own advantage.  In that situation – commonly referred to as partisan gerrymandering –  a current majority party draws district lines to virtually guarantee its majority against huge sways in popular opinion.  See Vieth v. Jubilirer, 541 U.S. 267, 345-46 (2004) (Souter, J., dissenting) (collecting scholarly work showing how gerrymandering can frustrate the popular will).  "Gerrymandering and other manipulations of electoral laws enable small,

- 2 -

transient majorities to leverage themselves into more enduring ones." Richard

Pildes, Constitutionalizing Democratic Politics, 118 Harv. L. Rev. 28, 60 (2004)

(emphasis added). Gerrymandering not only affects who wins elections, it chills

any challenge to the majority. See Samuel Issacharoff, Gerrymandering and

Political Cartels, 116 Harv. L. Rev. 593, 625 (2002) (nearly half of all seats in

state legislatures are unopposed because gerrymandering renders them "so safe as

not to generate any serious challenge."). Such gerrymandering is at least allowed

an open season every ten years; not so the present amendment.

What a majority of the voters in Utah have done in this case and what a

legislature engaged in partisan gerrymandering does is identical. A current

majority enshrines its gains in law against sways in popular opinion and does so

through election laws designed to channel results and to squelch dissent.

In Vieth, the Supreme Court faced a challenge under the Equal Protection

Clause to a partisan gerrymander in Pennslyvania. Four Justices joined a plurality

opinion holding that there were "no judicially discernible and manageable

standards for adjudicating political gerrymandering claims" and hence "political

gerrymandering claims are nonjusticiable." Vieth, 541 U.S. at 281. Four

dissenters argued that there were manageable standards that would render

Pennslyvania's gerrymander unconstitutional. Standing in the middle of this

dispute, and holding the swing vote, was Justice Kennedy, who wrote a

concurring opinion stating that, although there was no current standard for

determining the constitutionality of gerrymanders, one might develop. As such, the prudent decision was to wait for lower courts or litigants to develop such an approach and not bar partisan gerrymandering suits permanently. Id. at 311 (Kennedy, J., concurring)

Justice Kennedy argued that the approaches advanced by the dissenters as well as the litigants in the case were flawed because they were rooted in the wrong source of law – the Equal Protection Clause. Such analysis would always push the court to the political question of whether the partisan purpose had been excessive. Id.[1]

Despite the inapplicability of the Equal Protection Clause to partisan gerrymandering cases, Justice Kennedy would hold that the First Amendment provides the proper source of protection for political minorities. Justice Kennedy writes: "The First Amendment may be the more relevant constitutional provision in future cases that allege unconstitutional partisan gerrymandering." Id. at 317. He reasons that cases involving partisan manipulation of electoral laws "involve the First Amendment interest of not burdening or penalizing citizens because of their participation in the electoral process . . . or their expression of political views." Id. at 314. In the present case, a majority of Utahns passed the Wildlife Amendment to defeat wildlife legislation favored by "local animal extremists"

---

[1] Appellants in the case at bar chose not to advance an Equal Protection challenge.

and "to preserve Utah's wildlife practices from East Coast Special Interest groups" who planned to press "the Washington DC agenda" through the initiative process. The current majority in Utah chose to burden "citizens because of their participation in the electoral process [and] their expression of political views," implicating precisely the First Amendment interests identified by Justice Kennedy. Id. ("First Amendment concerns arise where a State enacts a law that has the purpose and effect of subjecting a group of voters . . . to disfavored treatment by reason of their views.").

Justice Kennedy does not explain exactly how the First Amendment should be used to analyze partisan gerrymandering claims. That task is left to litigants and lower courts. He did, however, explain the contours of such an analysis: "If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest." Id.

Instead of following Justice Kennedy's suggestion that lower courts fashion a manageable First Amendment standard, the majority opinion chooses to cast aside Supreme Court guidance on the matter and free such super-majority impositions, be they 66.67% or 99%, from all future constitutional scrutiny. In my judgment, a better approach would be to follow the First Circuit's decision in Wirzburger v. Galvin, 412 F.3d 271 (1st Cir. 2005). Wirzburger stands for the proposition that laws that bias electoral results also may unconstitutionally chill

- 5 -

election-related speech. The Massachusetts Constitution permits initiatives to amend the state constitution, but specifically bars initiatives implicating public funding of private education. Id. at 274; Mass. Const. amend. art. 48. Citizens who sought to pass such an amendment by initiative challenged the bar on First Amendment grounds.

Although acknowledging that the main purpose of the initiative ban was to regulate the passage of laws, not to regulate speech, the Wirzburger court recognizes that the "state initiative process provides a uniquely provocative and effective method of spurring public debate . . . ." Id. at 276. Discriminatory election regulations not only dictate outcomes – they also chill speech. The issue is not, as the majority in this case mischaracterizes it, whether the regulation makes "expression less persuasive or less likely to produce results." Maj. Op. at 43. Instead, the question is whether participation in an election has both speech and non-speech elements. Like Justice Kennedy in Vieth, the First Circuit reasons in Wirzburger that initiative elections are so suffused with speech that any attempt to control the outcome of an election affects the speech rights of those competing in the election. Given that election campaigns are necessarily conducted through the medium of speech, it is no more than foolhardy formalism to say that election laws that rig the outcome of elections do not infringe on speech rights. In America, at least, one cannot silently campaign – supporting an initiative requires speech.

This does not mean that a state constitutional amendment barring all legislation to change the status of wildlife law would be subject to a First Amendment challenge. Such outright bans on the passage of law are distinct from election laws, because the former establishes a substantive ban whereas the latter regulates conduct containing speech and non-speech elements. States do not offend the First Amendment when they enact substantive limits on the types of laws that can be passed. When, however, states stack the deck by writing electoral laws that produce a given outcome, First Amendment concerns arise because the speech of those who want to campaign to change the laws is directly limited.

The Massachusetts regulation at issue in Wirzburger operates like other bans on expressive conduct – action that contains both speech and non-speech components – that the Supreme Court has chosen to review. See, e.g., United States v. O'Brien, 391 U.S. 367, 382 (1968) (law banning the destruction of draft cards can be challenged under the First Amendment). Regulations governing expressive conduct are subject to intermediate scrutiny. O'Brien, 391 U.S. at 382. As such, "conduct combining 'speech' and 'non-speech' elements can be regulated if four requirements are met: (1) the regulation 'is within the constitutional power of the Government;' (2) 'it furthers an important or substantial governmental interest;' (3) 'the governmental interest is unrelated to the suppression of free expression;' and (4) 'the incidental restriction on alleged

First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" Wirzburger, 412 F.3d at 279 (quoting O'Brien, 391 U.S. at 377.).

In following this test, courts require states to present reasons for their electoral regulations. As is made clear in O'Brien and in Wirzburger, a state cannot justify an election regulation on the basis that it reflects an intent to help or punish a particular group. Rather, the reasons must be structural – that certain issues are, perhaps because of their complexity, not suitable for the initiative process, or that protecting minority interests, in some cases, requires a broader consensus than that of a simple majority. If a state's justification is important or substantial, and the restriction is no greater than essential to fulfill that interest, then the state's law is determined not to violate the First Amendment.[2]

This is not unlike the role courts fulfill in most election law cases. When deciding a challenge to laws affecting a political party's First Amendment right of association, we "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden

---

[2] Using O'Brien's intermediate scrutiny test is consistent with Justice Kennedy's admonition that "courts must be cautious about adopting a standard that turns on whether the partisan interests in the redistricting process were excessive. Excessiveness is not easily determined." Vieth, 541 U.S. at 315 (Kennedy, J., concurring). Applying O'Brien in this context does not require us to decide whether partisan interests are excessive; we only ask whether the state has an important, non-speech restricting interest in the law and whether the restriction of speech rights is no greater than necessary to further that interest.

necessary." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 355 (1997) (holding that state interests in stability and the two-party system justified a state law barring any one candidate from appearing on two different party ballots even though the law limited a party's First Amendment rights). See also Clingman v. Beaver, 125 S. Ct. 2029, 2038 (2005) (state interest in maintaining independent and viable political parties justifies state law barring a party from inviting to vote in their primary members of other parties); California Democratic Party v. Jones, 530 U.S. 567, 574 (2000) (finding a state-mandated "blanket primary" unconstitutional because state interest in promoting moderate candidates does not justify a limitation of a political party's free association rights).

Unlike right of association cases, a court adjudicating a free expression election case under O'Brien does not weigh competing interests. If the government's interest is important and the law is tailored to achieving that interest, that ends the analysis. The majority opinion suggests that there is something extraordinary about a court deciding whether an interest in this context is important or substantial. This ignores the fact that courts routinely make more difficult judgments in most election law cases.

Courts not only can make such determinations, they must. As in the present case, such laws cut to the very structure of our democracy. Rather than being the worst place for judicial intervention, this is where it is most essential. In most constitutional cases, courts face what is often referred to as the "counter-majoritarian difficulty." Alexander M. Bickel, The Least Dangerous Branch 16-

23 (1962).  We, unelected federal judges, interpret the Constitution to determine whether the pre-commitment strategy of the Founders invalidates the choices of current electoral majorities.[3]  The "counter-majoritarian difficulty" goes directly to our legitimacy in a constitutional system.  This case does not present such question about our legitimacy – when we review efforts by those currently in

---

[3] That Utah's constitutional amendment would have offended the Founders vision of democracy cannot be questioned.  One of the Fathers' cardinal concerns was that democratic government not lead to tyrannical rule by a majority over a minority.  "When a majority is included in a faction, the form of popular government . . . enables it to sacrifice to its ruling passion or interest both the public good and the rights of other citizens."  The Federalist No. 10, at 106 (J. Madison) (Hamilton ed. 1868).  The Founders did not think the problem of majority abuse of minorities was limited to those in government: they were particularly worried about the ways in which a majority of the people could impose their will impose on a minority.  "The prescriptions in favor of liberty, ought to be levelled against that quarter where the greatest danger lies, namely, that which possesses the highest prerogative of power: But this is not found in either the executive or legislative departments of government, but in the body of the people, operating by the majority against the minority."  James Madison, Speech of James Madison to House of Representatives (June 8, 1789) in Daniel A. Farber & Suzanna Sherry, A History of the American Constitution 227, 229 (1990).

James Madison responded to this problem by arguing that a large democracy contained within it the antidote to majority tyranny:  shifting alliances among factions that would serve to ensure that no one faction dominated over time.  "Extend the sphere, and you take in a greater variety of parties and interests; you make it less probable that a majority of the whole will have a common motive to invade the rights of other citizens; or if such a common motive exists, it will be more difficult for all who feel it to discover their own strength, and to act in unison with each other."  Id.  A large democracy poses "greater obstacles . . . to the concert and accomplishment of the secret wishes of an unjust and interested majority."  Id.  In Utah, proponents of the status quo on wildlife issues found a way to circumvent Madison's prescription for escaping majority tyranny.  They immortalized their majority in the state's election laws.  Therefore, their current majority is not subject to the shifting winds of public opinion.

power to entrench themselves, we are pro-majoritarian in that we are questioning laws that may have an anti-democratic effect. <u>See</u> Klarman, 85 Geo. L.J. at 497-98. Those who aspire to become the majorities of tomorrow, but are discriminated against today, have no recourse other than the courts. Future majorities that spring from today's unpopular opinions should not be strangled by the dead hands of the past. Because today's decision places a garrote in those very hands, I respectfully dissent.