**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 16, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

THOMAS MINK; THE HOWLING
PIG, an unincorporated association,

        Plaintiffs-Appellants,

v.

JOHN W. SUTHERS, in his official
capacity as Attorney General of the
State of Colorado, KENNETH R.
BUCK, District Attorney for
Colorado's 19th Judicial District;
SUSAN KNOX, a Chief Deputy
District Attorney working for
Colorado's 19th Judicial District
Attorney's Office, in her individual
capacity,

        Defendants-Appellees,

and

STUDENT PRESS LAW CENTER;
SILHA CENTER FOR THE STUDY
OF MEDIA ETHICS; WORLD PRESS
FREEDOM COMMITTEE;
ASSOCIATED PRESS;
BLOOMBERG NEWS; COLORADO
PRESS ASSOCIATION; DOW JONES
& COMPANY, INC.; MEDIA LAW
RESOURCE CENTER; THE
REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS;
COLORADO DISTRICT
ATTORNEYS' COUNCIL,

No. 04-1496

Amicus Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 04-B-23 (CBS))**

---

A. Bruce Jones, Holland & Hart LLP, Denver, Colorado (Marcy G. Glenn and Valerie L. Simons, Holland & Hart, Denver, Colorado, and Mark Silverstein, American Civil Liberties Union Foundation of Colorado, Denver, Colorado, with him on the briefs) for Plaintiffs-Appellants.

William V. Allen, Assistant Attorney General, Litigation Section, Office of the Colorado Attorney General, for Defendant-Appellee John W. Suthers, and David R. Brougham (Gillian Dale with him on the brief), Hall & Evans, L.L.C., Denver Colorado, for Defendant-Appellee Susan Knox.

S. Mark Goodman and Adam Goldstein, Student Press Law Center, Arlington, Virginia, and Jane E. Kirtley, Silha Center for the Study of Media Ethics and Law, Minneapolis, Minnesota, on the brief for Amici Curiae Student Press Law Center and Silha Center for the Study of Media Ethics and Law.

Kevin M. Goldberg, Cohn and Marks LLP, Washington, District of Columbia, on the brief for Amicus Curiae World Press Freedom Committee.

Thomas B. Kelley and Steven D. Zansberg, Faegre & Benson LLP, Denver, Colorado, on the brief for Amici Curiae Associated Press, Bloomberg News, Colorado Press Association, Dow Jones & Company, Inc., Media Law Resource Center, and The Reporters Committee for Freedom of the Press.

Miles Madorin, Staff Attorney, Colorado District Attorneys' Council, Denver, Colorado, on the brief for Amicus Curiae Colorado District Attorneys' Council.

---

Before **O'BRIEN**, **EBEL**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

## I. Introduction

Colorado law makes it "criminal libel" to knowingly publish any statement tending to "impeach the honesty, integrity, virtue, or reputation or expose the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, or ridicule."  Colo. Rev. Stat. § 18-13-105.  While a student at the University of Northern Colorado (UNC), Thomas Mink created and published an internet-based journal called *The Howling Pig*.  Several issues of the journal included Mink's pseudonymous column by "Junius Puke," which parodied the views of a real UNC professor named Junius Peake, and whose on-line photograph bore a strong resemblance to the real professor.

Professor Peake complained to the Greeley Police Department who commenced an investigation of Mink for potential violations of Colorado's criminal libel statute.  The police, in conjunction with the local district attorney's office, sought and obtained a search warrant, which they executed at Mink's residence, seizing his personal computer and other written materials.

Mink sued for prospective relief and damages under 42 U.S.C. § 1983, and for violations of the Privacy Protection Act, 42 U.S.C. § 2000aa.  The district court entered a temporary restraining order against the district attorney's office, but dismissed the case in its entirety after the office disavowed an intent to prosecute Mink.  The district court concluded that: (1) Mink's request for

declaratory judgment failed for lack of standing, (2) the statutory privacy claim failed to state a claim for relief, and (3) the damages claim against the assistant district attorney arising from the search was barred by absolute prosecutorial immunity.

Having jurisdiction pursuant to 28 U.S.C. § 1291, we affirm both the dismissal of Mink's facial challenge to the Colorado criminal libel statute because he lacks standing and his claim is moot, and the dismissal of his statutory damages claim for failure to state a claim. But we reverse the district court's dismissal of the damages claim arising from the search because we conclude it is not barred by absolute immunity. Accordingly, we remand to the district court for further proceedings on the question of qualified immunity.

## II. Background

Thomas Mink began releasing issues of *The Howling Pig*, a student-run, internet-based journal, during his fall 2003 semester as a student at the University of Northern Colorado. The journal, which was created, maintained, and published from the home computer Mink shared with his mother, addressed current events involving the local UNC community. Among other things, it featured a regular column from the editor, a fictional character named "Junius Puke." The column displayed obviously doctored photographs of an actual UNC professor, Junius Peak, wearing dark sunglasses and a Hitler-like mustache. The purpose of the column, according to Mink, was to "spoof[] and parod[y] Professor Peake by

-4-

addressing subjects on which the real professor would be unlikely to write, or through the assertion of views diametrically opposed to those of Professor Peake." Aplt. App. at 80–81.

After learning of the parody, Professor Peake contacted the local district attorney and swore out a complaint, alleging he was a victim of criminal libel. Colo. Rev. Stat. § 18-13-105. In response to the complaint, a Greeley Police Department detective opened an investigation. The detective reviewed copies of *The Howling Pig* and concluded that its editor was Mink. Based on this information, the detective prepared a search warrant affidavit according to procedures required by Colorado law. Colo. Rev. Stat. § 16-3-301; Colo. R. Crim. Proc. 41(b), (c). These procedures allow a detective to submit an affidavit to the office of the district attorney for legal review. Colo. Rev. Stat. § 20-1-106.1. Consequently, a deputy district attorney, appellee Susan Knox, reviewed and approved the search warrant affidavit, which was then presented to and approved by a magistrate judge.

With the search warrant in hand, Greeley police searched the home where Mink lived with his mother on December 12, 2003. The police confiscated Mink's personal computer and additional written materials referencing *The Howling Pig*. According to Mink, during the search one of the detectives told him he was in "big trouble" and led him to believe a criminal complaint had been filed. Mink also claims that a detective warned him that resuming publication of

*The Howling Pig* would only "make things worse for [him]." Aplt. App. at 82–83.

Following the search, Mink obtained counsel who contacted the Greeley police on December 23, 2003. According to Mink's counsel, the investigating officer disclosed his plans to recommend that criminal libel charges be filed against Mink. That same day, Mink's counsel informed a lawyer in the district attorney's office that he believed the criminal libel law could not be applied constitutionally against Mink for statements made in *The Howling Pig*. On December 30, 2003, Mink's counsel faxed a letter to the district attorney demanding the immediate return of materials seized from Mink's home and explaining Mink's position that prosecuting him under the criminal libel statute would be unconstitutional. The letter requested a reply by January 2, 2004, but the district attorney apparently never responded.

On January 8, 2004, Mink filed suit in federal district court seeking prospective declaratory relief that the Colorado criminal libel statute was unconstitutional under the First Amendment and also requesting damages for the search and seizure conducted pursuant to the statute. With respect to the first claim, the complaint alleged Mink faced "an imminent threat of being charged with a violation of Colorado's Criminal Libel Statute," Aplt. App. at 10, and that the "criminal investigation, the threatened prosecution, and the search and seizure

have chilled Mr. Mink from exercising his right to freedom of expression and his right to freedom of speech." Aplt. App. at 15.

Mink also requested a temporary restraining order. On January 9, 2004, the district court ordered:

> that the District Attorney for the 19th Judicial District shall not initiate the prosecution of Thomas Mink under Colorado's Criminal Libel Statute, C.R.S. § 18-13-105, and the City of Greeley shall, forthwith, return to the Plaintiffs the computer, and all contents thereof, seized following the search of Plaintiffs' home in Ault, Colorado.

Dist. Ct. Order, Jan. 9, 2004, at 1.

The district court subsequently held a status conference during which it learned the district attorney would not be filing charges against Mink. In addition, the district attorney issued a written "No File" decision, concluding the statements contained in *The Howling Pig* could not be prosecuted under the statute. Thereafter, pursuant to an agreement of the parties, the court issued an order vacating its temporary restraining order.

Mink filed an amended complaint on February 19, 2004 on behalf of himself and *The Howling Pig*. The amended complaint repeated his allegations that the Colorado criminal libel statute was unconstitutional, and also named the Colorado Attorney General and the local district attorney as defendants in their official capacities for purposes of seeking prospective relief. Mink also realleged violations of his statutory and constitutional rights based on the search of his residence. He further claimed he had published two new issues of *The Howling*

-7-

*Pig* since the filing of the complaint which contained statements that might be construed as violations of Colorado's criminal libel statute, and said he planned to continue publishing such statements in the future. In addition, he named Susan Knox, the deputy district attorney who reviewed and approved the search warrant affidavit, in her individual capacity under 42 U.S.C. § 1983 and the Privacy Protection Act, 42 U.S.C. § 2000aa.[1]

The district attorney answered the amended complaint on April 9, 2004, admitting most of its allegations. After the defendants filed dispositive motions, the district court dismissed Mink's suit in its entirety because (1) he lacked standing to challenge the constitutionality of the criminal libel statute, (2) he failed to properly state a statutory claim for relief under the Privacy Protection Act, and (3) his constitutional claims against the deputy district attorney were barred by absolute immunity.

## III. Discussion

This appeal raises three issues: first, whether we have jurisdiction to consider Mink's facial constitutional challenge to the criminal libel statute in light of the district attorney's disavowal of an intent to prosecute; second, whether Mink's claim for damages under the federal Privacy Protection Act states a cause of action against public officials who did not participate in the search of

---

[1] By this time, Mink had dropped his claims against the Greeley police department and the individual detective named in the original complaint.

Mink's residence; and third, whether Mink's claims for damages against the attorney who reviewed the search warrant are barred by the doctrine of absolute prosecutorial immunity.

We accept all well-pleaded facts as true for purposes of resolving an appeal from a motion to dismiss.[2] *Ruiz v. McDonnell*, 299 F.3d 1173, 1181 (10th Cir. 2002), *cert. denied*, 538 U.S. 999 (2003). We view the facts as alleged in the complaint in the light most favorable to the plaintiffs, and we will uphold the dismissal only if it appears beyond doubt that they can prove no set of facts which would entitle them to relief. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1088–89 (10th Cir. 2006).

## A. Facial Challenge to Colorado's Criminal Libel Statute

### 1. Summary of Constitutional Claims

Before turning to the threshold jurisdictional issues, we provide a brief summary of Mink's constitutional argument. This background bears on both the underlying procedural posture of the case, as well as the claims asserted against the prosecutor who reviewed the affidavit in support of the search warrant.

Mink requests a declaration that the Colorado criminal libel statute is facially unconstitutional under the First Amendment. His amended complaint names the Colorado Attorney General and the District Attorney as defendants.

---

[2] Mink also appeals the district court's denial of his motion for partial summary judgment. Because we affirm the dismissal of his claim for declaratory relief, we do not reach this issue.

Colorado's criminal libel statute provides:

(1) A person who shall knowingly publish or disseminate, either by written instrument, sign, pictures, or the like, any statement or object tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation or expose the natural defects of one who is alive, and thereby to expose him to public hatred, contempt, or ridicule, commits criminal libel.

(2) It shall be an affirmative defense that the publication was true, except libels tending to blacken the memory of the dead and libels tending to expose the natural defects of the living.

(3) Criminal libel is a class 6 felony.

Colo. Rev. Stat. § 18-13-105.

Mink's primary contention is that the Colorado criminal libel statute is overbroad because it implicates conduct that is constitutionally protected. In support of his argument, Mink points to United States Supreme Court case law requiring a party bringing a libel action to prove (1) fault of the speaker and (2) falsity of the statement. Specifically, the Supreme Court has held false statements on matters of public concern regarding public figures are protected unless they are made with "actual malice"—i.e., with knowledge the statements are false or with reckless disregard as to whether they are false or not. *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964). False statements on matters of public concern regarding private figures are protected unless they are made negligently. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 352 (1974). In public concern

cases, the party bringing the action also bears the burden of proving the falsity of the statement. *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 776 (1986).

Mink alleges *The Howling Pig* was devoted to matters of public concern to the UNC community, such as lack of faculty diversity and free speech on campus. Further, he alleges Professor Peake often voiced his views publicly and has therefore arguably rendered himself a public figure for First Amendment purposes. Mink does not, however, bring an "as applied" challenge to the statute. Instead, he argues the statute is unconstitutional on its face because it punishes libelous statements with no fault requirement and without placing the burden of proving falsity on the prosecutor.

Mink further contends the Colorado Supreme Court's subsequent interpretation of the statute does not cure the constitutional infirmities. The United States Supreme Court has long respected the ability of state high courts to narrow overbroad statutes so as to solve constitutional problems. *Osborne v. Ohio*, 495 U.S. 103, 119 (1990). In 1991, the Colorado Supreme Court narrowed the potential scope of the criminal libel law in *People v. Ryan,* 806 P.2d 935 (Colo. 1991):

> From the United States Supreme Court's pronouncements concerning libel we discern a precise category of protected conduct that falls outside of the legitimate sweep of section 18-13-105. That category consists of libelous statements about public officials or public figures involving matters of public concern. This category of constitutionally protected conduct gives us a clear line by which to distinguish the statute's constitutional and unconstitutional applications. We therefore

-11-

hold that section 18-13-105 is *invalid only insofar as it reaches constitutionally protected statements about public officials or public figures on matters of public concern.* Our partial invalidation, however, affects only the application of subsection (1) of the statute. Truth shall remain an affirmative defense pursuant to section 18- 13-105(2) . . . and article II, section 10, of the Colorado Constitution.

*Id.* at 940–41(footnotes omitted).

According to Mink, *Ryan* did not limit the statute's applicability with regard to statements made about *private* individuals on matters of *public* concern, and thus the law continues to run afoul of the First Amendment. He claims these statements are still punishable under Colorado law, even when made non-negligently and even when the party bringing the action has not proven their falsity.[3]

With that backdrop, we turn to the procedural posture of Mink's constitutional claim in light of the district attorney's disavowal of an intent to prosecute him under the statute.

## 2. Jurisdiction—Standing and Mootness

To pursue a case in federal court, a plaintiff must satisfy the twin requirements of standing and mootness. *Winsness v. Yocom*, 433 F.3d 727, 731 (10th Cir. 2006). Without a live, concrete controversy, we lack jurisdiction to

---

[3] That the plaintiff must prove falsity flows from *Ryan*'s constitutional analysis. Moreover, the Colorado Supreme Court had previously ruled that truth is a defense under the statute. *Gomba v. McLaughlin*, 504 P.2d 337 (Colo. 1972); *see also Diversified Management v. Denver Post*, 653 P.2d 1103 (Colo. 1982) (discussing speech protections for matters of public concern).

consider claims no matter how meritorious.  Because we conclude Mink faces "no credible threat of prosecution" under the criminal libel statute, he lacks standing to pursue his claims for prospective relief.[4]  For the same reasons, we also conclude his claim is moot.  Therefore, we cannot reach the merits of his constitutional challenge to the statute.

*a. Standing.*  To establish standing, Mink must show (1) he has suffered an injury in fact, (2) traceable to the defendants, (3) that can be redressed by a favorable decision of this Court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004).  A plaintiff's injury must be "actual or imminent, not conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.

In freedom of expression cases, injury in fact can be shown by alleging (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute," and (2) "a credible threat of future prosecution."  *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003).  "Allegations of possible future injury do not satisfy the injury in fact requirement, though a plaintiff need not expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."  *Initiative & Referendum Inst. v. Walker*, 450 F.3d at

---

[4] The deputy district attorney has not challenged Mink's standing to pursue the statutory and common law damages claims.

1087–88 (internal quotations omitted). But the "mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Winsness*, 433 F.3d at 732.

To satisfy the injury in fact requirement, the plaintiff must demonstrate that expressive activities will be inhibited by "an objectively justified fear of real consequences, which can be satisfied by showing a credible threat of prosecution or other consequences following from the statute's enforcement." *Id.* While "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974), they do not confer standing to pursue prospective relief without some credible threat of future injury. *See Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983). "[A]ssurances from prosecutors that they do not intend to bring charges are sufficient to defeat standing, even when the individual plaintiff had actually been charged or directly threatened with prosecution for the same conduct in the past." *Winsness*, 433 F.3d at 731 (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).

But standing is determined at the time the action is brought, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC)*, 528 U.S. 167, 180 (2000), and we generally look to when the complaint was first filed, not to subsequent events. *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1153 (10th Cir. 2005) (internal

-14-

citations omitted). In this case, however, the standing inquiry is complicated by the unique timeline of events. Mink's original and amended complaint both allege that as of January 8, 2004, Mink "face[d] an imminent threat of being charged with a violation of Colorado's Criminal Libel Statute." Aplt. App. at 77. Before answering the complaint, the district attorney's office concluded it could not prosecute the case and issued a "No File" decision on January 20, 2004. Mink filed an amended complaint on February 19, 2004. Although an investigation was pending at the time the complaint was filed, the threat of prosecution was still speculative at that time. Moreover, by the time he filed the amended complaint, even the investigation had entirely dissipated. We look to the amended complaint in assessing a plaintiff's claims, including the allegations in support of standing. And since an amended complaint "supercedes an original complaint and renders the original complaint without legal effect," *In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000); 3 Moore's Federal Practice, § 15.17[3] (Matthew Bender 3d ed.), the justiciability of Mink's constitutional claim is further cast in doubt.

Given this procedural posture, our cases suggest several outcomes:

(1) In *Faustin v. City & County of Denver*, 268 F.3d 942 (10th Cir. 2001), we held the disavowal of an intent to prosecute under a statute *prior* to the filing of a complaint defeated standing.

(2) In *D.L.S. v. Utah*, 374 F.3d 971 (10th Cir. 2004), we held the disavowal of an intent to enforce a criminal sodomy statute against the plaintiff *after* the complaint was filed, even if it might be enforced against another class of persons, was enough to defeat standing.[5]

(3) Finally, in *Winsness v. Yocom*, 433 F.3d 727 (10th Cir. 2006), we found lack of standing in two situations where the plaintiff sought prospective relief from prosecution under a statute: (a) where the plaintiff "received assurances from the District Attorney that the flag-abuse statute [would] not be enforced against him" though the assurances came "after [the plaintiff] filed his lawsuit," *id.* at 733; and (b) where the plaintiff was already cited for flag-abuse, but the prosecutor quickly dropped the charges and disavowed an intent to prosecute before the plaintiff filed his suit.

Each of these cases concluded the plaintiff lacked standing because he could not establish a "credible fear of prosecution" under the challenged statute. Mink's facts differ only slightly from these precedents. Uniquely, the disavowal of prosecution in this case came *between* the time the lawsuit was filed and the filing of the amended complaint. At the time the original complaint was filed, moreover, police had conducted a search of Mink's residence, seized his computer and papers, and were retaining them pending further investigation. Attempts by

---

[5] The only distinction between *D.L.S.* and the present case is that the *D.L.S.* plaintiff was not exposed to prior threat of prosecution.

Mink's counsel to dissuade the district attorney from charging him had yet to bear fruit. Thus, when he brought the suit Mink appeared to have a legitimate basis for alleging a credible fear of future prosecution.

Nonetheless, we conclude Mink lacks standing under our case law. First, based on his review of controlling Supreme Court precedents, the district attorney disclaimed an intent to prosecute immediately after the lawsuit was filed. In both *D.L.S.* and *Winsness*, the prosecutor's quick disavowal of an intent to prosecute demonstrated a lack of injury in fact.[6] No charges were ever filed against Mink and the district attorney publicly announced he would not prosecute well before his office filed an answer or motion to dismiss. Where a plaintiff only seeks prospective relief, standing is defeated when there is evidence the government will not enforce the challenged statute against the plaintiff. *See*, *e.g.*, *Harmon v. City of Kansas City*, 197 F.3d 321, 327 (8th Cir. 1999) (plaintiffs lost standing to seek an injunction when city conceded all of their activities were constitutionally protected and were not prohibited by the ordinance).

Second, it is significant Mink filed an amended complaint after the district attorney disclosed his intent not to prosecute. The sequence of events confirms Mink had no "injury in fact" for prospective relief when he filed his amended

---

[6] Similarly, the city attorney in *Faustin* apparently concluded prior to the filing of the complaint that the statute could not be applied to the plaintiff, although that conclusion was not disclosed until after the case commenced.

complaint.[7]  Any threat against Mink at that time was "hypothetical," not "actual

and imminent."

Finally, although the "No File" letter conceivably might not bind other

district attorneys, we have held the "possibility" of future enforcement need not

be "reduced to zero" to defeat standing.  *Winsness*, 433 F.3d at 733.  It is "not

necessary for defendants [] to refute and eliminate all possible risk that the statute

might be enforced" to demonstrate a lack of a case or controversy.  *Id.*  Since this

case commenced, moreover, the office of *both* the Attorney General and the

District Attorney has changed hands with no change in the government's position

that the statute will not be enforced against Mink.[8]

Mink, however, suggests the district attorney fumbled away its disavowal

by admitting in the answer to the amended complaint that Mink faced an

imminent threat of prosecution.  In the context of the procedural posture of this

case and especially in light of the district attorney's "No File" letter, this

oversight is of no significance.  It is obvious no charges against Mink would be

pursued, and, as we have explained, "[n]othing in our case law prevents

---

[7] *See In re Atlas Van Lines, Inc.*, 209 F.3d 1064, 1067 (8th Cir. 2000).

[8] Both the current Attorney General and District Attorney, and their predecessors, firmly rejected any intent to prosecute Mink under the statute before the district court, in their submissions to us, and in oral argument.  We take them at their word.

-18-

government actors from responsibly retreating from an ill-advised prosecution, in response to controlling Supreme Court authority." *Winsness*, 433 F.3d at 736.

The government should be encouraged, not dissuaded, from assuring citizens that it will not pursue prosecutions based on statutes that cannot be constitutionally enforced. Given the realities of a public law office, it is not surprising the ultimate legal conclusion here—the case could not be prosecuted—would be made at the highest policy levels. By jumping the gun and filing a complaint for prospective relief, a plaintiff cannot retain standing where the prosecutor immediately concludes the statute cannot be constitutionally enforced.

Based on the representations of the public officials charged with enforcing the statute against Mink, we agree with the district court that "no credible threat of prosecution" existed when Mink filed his amended complaint. Thus, he lacks standing to seek prospective relief.

**b. Mootness.** Even if we were to assume a credible threat of prosecution existed before the lawsuit was filed, we also conclude Mink's claim for prospective relief is moot. "[I]t is not enough that a dispute was very much alive when suit was filed, or when review was obtained," a live controversy must remain throughout the litigation. *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477–78 (1990). Article III of the Constitution limits us to live controversies that exist at *all* stages of litigation, including appellate review. *Moongate Water Co.*

*v. Dona Ana Mut. Domestic Water Consumers Ass'n*, 420 F.3d 1082, 1088 (10th Cir. 2005). When "intervening acts destroy a party's legally cognizable interest" in the lawsuit, the federal courts are deprived of jurisdiction. *Id.*

Merely stopping the complained of conduct ordinarily is not enough, however, to establish mootness. "For good reason, courts are reluctant to deem a controversy moot based merely on assurances from the defendants that they will not engage in unlawful activity again." *Winsness*, 433 F.3d at 736 (citing *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) ("[V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, [in part because] . . . [t]he defendant is free to return to his old ways.")). Instead, a defendant must show "no reasonable expectation that the wrong will be repeated." *W. T. Grant Co.*, 345 U.S. at 633 (internal citations and quotations omitted). But in many circumstances it is obvious previously threatened conduct cannot reasonably be expected to recur. *See, e.g., Tandy v. City of Wichita*, 380 F.3d 1277, 1291 (10th Cir. 2004) (finding a controversy moot because a city had provided documents demonstrating it had changed its practices to comply with federal law and because "[n]othing in the record suggests [the defendant] intends to resume its discontinued policies . . . .").

We recently discussed mootness in a First Amendment declaratory judgment case challenging Utah's flag desecration statute. *Winsness*, 433 F.3d 727. In *Winsness*, a Salt Lake City resident burned a symbol onto a United States

flag and hung the flag on his garage. A neighbor reported the incident to police, and Winsness was cited for flag-abuse. The flag was confiscated as evidence. After the citation was filed, prosecutors concluded the ordinance could not be constitutionally enforced against Winsness and "immediately scuttled" the case. The district attorney filed an affidavit with the court assuring it that charges would not be pursued. Based on that record, we concluded that "[e]ven if we assume that a credible threat of prosecution existed before this lawsuit was filed, the prosecutors' affidavits have rendered the controversy moot." *Winsness*, 433 F.3d at 736. The government had "foresworn any intention to bring criminal charges against individuals who alter the flag for expressive purposes" and had "categorically announc[ed]" the office would "bring no prosecutions under the statute." *Id*. at 736. We found these assurances established mootness since the government (1) had quickly repudiated the action initially taken against Winsness, (2) its statements were made in sworn affidavits, and (3) it based its decision on controlling Supreme Court precedent, making future prosecutions unlikely.

These factors similarly cut against Mink. First, no citation or formal charges were ever brought against Mink. And prior to the filing of charges the district attorney preemptively issued a legal opinion that precluded prosecution. His opinion letter explained the statute could not be constitutionally applied to the conduct attributed to Mink, and, accordingly, charges would not be filed in this matter.

Second, although the "No File" decision was not in the form of an affidavit, the district attorney took an unequivocal position (1) advising Mink in writing, and (2) advising the court that Mink would not be prosecuted under the statute now or in the future. We find persuasive, as did the district court, the district attorney's repudiation of an intent to prosecute, and its representation of the same to us on appeal.

Finally, the parties concede on appeal that Supreme Court precedent makes enforcement of the Colorado criminal libel statute unconstitutional under the facts as alleged here. The parties have conceded Professor Peake is a public figure, and well established case law requires falsity and actual malice to prove libel. *Gertz*, 418 U.S. 323. Moreover, the Colorado Supreme Court has interpreted that statute to embody these standards. *People v. Ryan*, 806 P.2d 935 (Colo. 1991). Accordingly, the district attorney recognized the force of these precedents and his "No File" decision supports our conclusion that the third *Winsness* factor has been met in this case.

Despite these assurances, Mink contends the district attorney's disavowal is limited to the specific statements made in the first three issues of *The Howling Pig* and does not apply more broadly to the *type* of statements that sparked this controversy or to those statements which might appear in future editions of the publication. In short, he claims that without a ruling that the Colorado criminal libel law is unconstitutional, he may be subject to prosecution in the future. We

-22-

find this argument unpersuasive. The analysis provided by the attorney general and district attorney demonstrate their legal reasons for not enforcing the statute in this case would carry over to further statements of the type Mink has subsequently made or intends to make. Although the district attorney's "No File" decision was based upon the pending investigation, we see no reason his analysis would not apply to subsequent statements that are legally indistinguishable.

In short, we see no credible threat of prosecution against Mink. The district attorney did what one would hope from a public official: he "responsibly retreat[ed] from an ill-advised prosecution, in response to controlling Supreme Court authority." *Winsness*, 433 F.3d at 736. Because standing and mootness are jurisdictional and non-waivable, *Moongate Water Co.,* 420 F.3d at 1088, we need not consider the merits of Mink's First Amendment challenge to the Colorado criminal libel statute in this case.

**B. Damages Claim under Privacy Protection Act**

Mink also seeks damages under 42 U.S.C. § 1983 for alleged violations of the Privacy Protection Act. The Act creates a right of action for the improper seizure of media materials:

> Notwithstanding any other law, it shall be unlawful for a government officer or employee, in connection with the investigation or prosecution of a criminal offense, to search for or seize any work product materials possessed by a person reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication, in or affecting interstate or foreign commerce; but this provision shall not impair or affect the ability of any

government officer or employee, pursuant to otherwise applicable law, to search for or seize such materials, if . . . there is probable cause.

42 U.S.C. § 2000aa.

Mink alleges his statutory rights were violated when Greeley police entered his home and seized materials relating to *The Howling Pig.* He does not, however, name any of the officers who conducted the search.[9] Instead, he seeks a judgment against the deputy district attorney for her role in reviewing the affidavit in support of the search warrant, which he claims lacked probable cause.

Relying on the text of the statute, which makes it unlawful "to *search for or seize* any work product materials," the district court dismissed the claim. Here, Mink did not allege the district attorney directed, controlled or participated in the search or seizure. Since the statute includes no language covering predicate acts by other officials, such as the legal review of the warrant application, the district court concluded no liability attached to the district attorney.

We agree. The plain language of the statute precludes liability for a person who did not engage in a search. In an analytically similar case, *Citicasters v. McCaskill,* 89 F.3d 1350 (8th Cir. 1996), the Eighth Circuit concluded the statute covered only a defendant who "directed, supervised, or otherwise engaged in the *execution* of the warrant to such an extent that a finding can be made that she

_____

[9] Mink initially sued both police officials and the City of Greeley but voluntarily dropped both of those claims.

-24-

'searched for or seized' the [materials]." *Id.* at 1356 (emphasis added). In *Citicasters*, the facts centered around the prosecutor's actions taken *after* the search warrant was issued and involved an allegation that the prosecutor actively assisted in the search. Here, by contrast, Mink has not alleged any conduct that could be construed as assisting in the warrant's execution.

Accordingly, we affirm dismissal of this claim against the deputy district attorney.

## C. Damages Claim Against the District Attorney

The most difficult issue in this case is Mink's claim for damages against the deputy district attorney based on her review of the application for a search warrant. The district attorney argues that this conduct is protected by the doctrine of absolute prosecutorial immunity. The district court agreed, concluding the prosecutor acted as "an officer of the court" in a "quasi-judicial" capacity to which absolute immunity applied.

### 1. Legal Framework

Absolute prosecutorial immunity is a complete bar to a suit for damages under 42 U.S.C. § 1983. *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). The doctrine evolved from the absolute immunity judges historically enjoyed for "any judicial act done by them within their jurisdiction." *Bradley v. Fisher*, 80 U.S. 335, 351 (1871).

Traditionally, the doctrine did not apply to other public officials—such as police officers, governors, and other executive officials—who were entitled only to qualified immunity for actions performed in their official capacity. Under the common law, the scope of immunity for prosecutors was limited to suits for malicious prosecution and defamation, although its reach in § 1983 damages cases was unclear. *Imbler*, 424 U.S. at 421.

*a. Supreme Court Framework.* The Supreme Court developed the modern doctrine of prosecutorial immunity in § 1983 cases in a series of cases beginning in 1976. In *Imbler v. Pachtman*, the Court rejected the argument that limited, or qualified, immunity would be adequate to protect the prosecutor from the threat of litigation that could shade their otherwise independent judgment. Merely providing qualified immunity would "prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." 424 U.S. at 427–28. According to the Court, it was "better to leave unredressed the wrongs done by dishonest officers [of the court] than to subject those who try to do their duty to the constant dread of retaliation." *Id.* at 428 (quoting Learned Hand in *Gregiore v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). Thus, prosecutors are absolutely immune for those activities "intimately associated with the judicial phase of the criminal process." 424 U.S. at 430. To apply this standard, the Court crafted a "functional approach" by

which we examine only the actions taken by the prosecutor "in initiating [] and in presenting the State's case" for trial. *Id.* at 431.

The Supreme Court was careful to note, however, that not every activity of a prosecutor involves initiating and presenting a case. Absolute immunity does not extend to "those aspects of the prosecutor's responsibility that cast him in the *role of an administrator or investigative officer rather than that of advocate*." *Id.* at 430–31 (emphasis added):

> We recognize that the duties of the prosecutor in his role as an advocate for the State involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom . . . . *Preparation, both for the initiation of the criminal process and for a trial, may require the obtaining, reviewing, and evaluating of evidence. At some point, and with respect to some decisions, the prosecutor no doubt functions as an administrator rather than as an officer of the court.* Drawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them.

*Id.* at 431 n.33 (emphasis added). Concluding the challenged conduct in *Imbler* fell on the advocacy side of the spectrum, the Court granted the prosecutors absolute immunity against the claim that they had procured false testimony during the course of a criminal trial.

The Supreme Court later extended the doctrine of absolute immunity to some prosecutorial conduct occurring *before* trial. In *Burns v. Reed*, 500 U.S. 478 (1991), a prosecutor was accused of (1) eliciting false testimony in a probable cause hearing that led to the issuance of a search warrant, and (2) advising police on inappropriate methods of interrogating a suspect.

-27-

Regarding the probable cause hearing, the Court concluded absolute immunity extended to "any hearing before a tribunal which performed a judicial function" and included the presentation of testimony in support of an application for a search warrant. *Id*. at 490 (internal quotations omitted). "The prosecutor's actions at issue here—appearing before a judge and presenting evidence in support of a motion for a search warrant—clearly involve the prosecutor's role as *advocate* for the State, rather than his role as administrator or investigative officer, the protection for which we reserved judgment in *Imbler*." *Id.* at 491 (internal quotations omitted) (emphasis added).[10] The Court went on to observe, "since the issuance of a warrant is unquestionably a judicial act, appearing at a probable-cause hearing is intimately associated with the judicial phase of the criminal process." *Id.* at 479 (internal citations and quotations omitted).

*Burns*, however, did not extend absolute immunity to every aspect of the prosecutor's legal advice to police. The Supreme Court concluded that advising police in the investigative phase of a criminal case could be too far removed from the judicial process to warrant extending immunity on that basis. It thus rejected the argument that legal advice is categorically "of a judicial nature because the prosecutor is, like a judge, called upon to render opinions concerning the legality

---

[10] Importantly, the Court read the plaintiff's claim narrowly and did not consider the prosecutor's motivations in seeking the search warrant or his actions outside the courtroom in relation to his procurement of the warrant. *See id.* at 487–89 & n.5.

of conduct." *Id.* at 493 (internal quotations omitted). Noting it had previously rejected the extension of absolute immunity to police officers, the Court found it "incongruous to allow prosecutors to be absolutely immune from liability for giving advice to the police, but to allow police officers only qualified immunity for following [that] advice." *Id.* at 495.

The Court also rejected the government's argument that "giving legal advice is related to a prosecutor's role[] in screening cases for prosecution and in safeguarding the fairness of the criminal judicial process." *Id.* As the Court pointed out, "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute." *Id.* "We do not believe, however, that advising the police in the investigative phase of a criminal case is so 'intimately associated with the judicial phase of the criminal process,' that it qualifies for absolute immunity." *Id.* at 493 (quoting *Imbler*, 424 U.S. at 430).[11]

To qualify for absolute immunity, then, an action must be "closely associated with the judicial process." *Id.* at 495. Advising police on interrogation methods or "the existence of probable cause" does not qualify. *Id.* at 487.

_____

[11] Justice Scalia, in a concurrence, would have gone further. He concluded that there is "no absolute immunity for procuring a search warrant" since that act is so far "removed from the judicial phase of criminal proceedings than the act of a prosecutor in seeking an indictment." 500 U.S. at 504–05 (quoting *Malley v. Briggs,* 475 U.S. 335, 342–43 (1986)).

The Supreme Court refined the investigative/advocacy distinction in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993). In that case, the plaintiff accused prosecutors of fabricating evidence during the preliminary investigation of a crime. In finding the pretrial investigation was not entitled to absolute immunity, the Court emphasized, "We have not retreated . . . from the principle [articulated in *Burns*] that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Id.* at 273. But there is "a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* The Court ultimately concluded that, where there is no common-law tradition of immunity for a function, a prosecutor "neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Id.* at 274 & n.5.

The Supreme Court's final and most recent case on prosecutorial immunity is similarly instructive. In *Kalina v. Fletcher*, 522 U.S. 118 (1997), a prosecutor was sued for her (1) preparation and filing of an information and motion for an arrest warrant, and (2) attestation to the truth of the facts contained in the accompanying affidavit. The Court found absolute immunity for the first activity

but not for the second. It concluded the preparation and filing of the information and motion "was part of the advocate's function," *id.* at 129, since she was acting as an advocate in "her drafting of the certification, her determination that the evidence was sufficiently strong to justify a probable-cause finding, her decision to file charges, and her presentation of the information and the motion to the court . . . indeed, even the selection of the particular facts to include in the certification to provide the evidentiary support for the finding of probable cause." *Id.* at 130.

In contrast, attesting to the accuracy of the facts in the affidavit, the prosecutor was acting as a complaining witness rather than a lawyer. *Id.* at 129. The key, according to the Court, was whether the task "involved the exercise of professional judgment," not merely the review of the "truth or falsity of the factual statements themselves." *Id.* at 130.

**b.  Tenth Circuit Framework.** We have applied the above Supreme Court precedent in a variety of contexts. In *Roberts v. Kling*, 104 F.3d 316, 319 (10th Cir. 1997), for example, we found absolute immunity applied to a deputy district attorney who approved a criminal complaint for prosecution. We emphasized, however, that ours is a "continuum based approach" and the "more distant a function is from the judicial process, the less likely absolute immunity will attach." *Id.* at 318–19 (quoting *Gagan v. Norton*, 35 F.3d 1473, 1475 (10th Cir. 1994)). The "determinative factor is 'advocacy' because that is the

prosecutor's main function and the one most akin to his quasi-judicial role." 104 F.3d at 319.

But "absolute immunity may attach even to . . . administrative or investigative activities when these functions are necessary so that a prosecutor may fulfill his function as an officer of the court." *Pfeiffer v. Hartford Fire Ins. Co.*, 929 F.2d 1484, 1490 (10th Cir. 1991). Thus, we have found absolute prosecutorial immunity for (1) preparation and initiation of charges, *id.*; (2) prosecuting civil and administrative enforcement proceedings, *Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990); and (3) investigating and filing a commitment proceeding, *Scott v. Hern*, 216 F.3d 897 (10th Cir. 2000).

*c.  Summary.*  As the above cases demonstrate, there is no bright line between advocacy and investigation.  It is clear that a prosecutor's courtroom conduct falls on the advocacy side of the line.  *Buckley*, 509 U.S. at 274.  And it is equally clear that advocacy is not limited to filing criminal charges or arguing in the courtroom.  *Id.* at 272.  Thus, especially when considering pre-indictment acts, it is important to consider other factors, such as (1) whether the action is closely associated with the judicial process, *Burns*, 500 U.S. at 495, (2) whether it is a uniquely prosecutorial function, *id.* at 491 n.7, and (3) whether it requires the exercise of professional judgment, *Kalina*, 522 U.S. at 130.

In sum, a prosecutor is entitled to absolute immunity for those actions that cast him in the role of an advocate initiating and presenting the government's case.

Absolute immunity, however, does not extend to those actions that are investigative or administrative in nature, including the provision of legal advice outside the setting of a prosecution. *See Imbler*, 424 U.S. at 430–31; *Burns*, 500 U.S. at 486, 493–94.

### 2. Application

We now turn to whether absolute immunity applies to the deputy district attorney's review of the affidavit in support of the search warrant in Mink's case. For the following reasons, we conclude the district attorney was not wearing the hat of an advocate and, thus, is not entitled to absolute prosecutorial immunity.

As a preliminary matter, the district attorney does not contend she acted as an advocate "intimately involved" in a judicial proceeding. Rather, she alleges her role was limited to review and approval of the search warrant application; she does not even contend she evaluated whether probable cause existed to arrest or press charges. At the time she reviewed the affidavit, moreover, police had only the allegations of Professor Peake and had not yet confirmed the authorship of the articles contained in *The Howling Pig*. It is obvious the search of Mink's residence was part of a continuing effort to obtain evidence and the attorney's review was, at most, legal advice as to the sufficiency of the affidavit. It is also clear that the district attorney was far from filing charges at the time of the search, and subsequent events show that the office came to believe the case could not be prosecuted.

Second, the review of the affidavit cannot be said to be a uniquely prosecutorial role. While it is laudable that a legal review occur before the police proceed to a magistrate for a warrant, the Supreme Court made it clear in *Burns* that a legal review for the sufficiency of evidence to support probable cause is not sufficient to confer absolute immunity. Absolute immunity applies to the "prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Burns*, 500 U.S. at 494. And while it may at times be difficult to discern the line between "investigation" and "advocacy," here we do not even have a case where the prosecutor was preparing for her "role as advocate for the State." *Buckley*, 509 U.S. at 271. No one suggests that the district attorney was preparing for a judicial proceeding in merely reviewing the affidavit.

Finally, although the review of the affidavit can be said to require the exercise of professional judgment, that is true every time a prosecutor provides legal advice. Under the Supreme Court's functional approach, we look to which role the prosecutor is performing—advocate or investigator. Here, the review of the affidavit squarely falls on the side of investigatory legal advice, and not advocacy before a judicial body. The deputy district attorney played no role in preparing the affidavit, nor was she involved in preparing, analyzing, and presenting pleadings to a court. If she were, this would be quite a different case.

We acknowledge this conclusion is complicated by those cases where prosecutors have been absolutely immunized for drafting, filing, and arguing in

-34-

support of an arrest or search warrant. *See Kalina*, 522 U.S. at 129–31(arrest warrant); *Burns*, 500 U.S. at 487 (search warrant). And the Supreme Court has explicitly recognized "the issuance of a search warrant is unquestionably a judicial act." *Burns*, 500 U.S. at 492. In those cases, however, the prosecutor was acting as an advocate—evaluating evidence, preparing pleadings, and appearing in court. It may be true that a lawyer's more active involvement in preparing a warrant application and presenting it in court will confer absolute immunity. But in this case the prosecutor's function was not that of an advocate; her function was to provide legal advice outside the courtroom to aid a nascent investigation. The "premise of *Burns* was that, in providing advice to the police, the prosecutor acted to guide the police, not to prepare his own case." *Buckley*, 509 U.S. at 285 (Kennedy, J., concurring). Here, the prosecutor was not preparing her case. Accordingly, in these circumstances, immunity does not attach.

The district attorney urges us to consider her reliance on Colorado law in support of a finding of absolute immunity. Colorado law requires district attorneys to "render, in their quasi-judicial capacity, legal advice to peace officers, upon the request of such officers or of the court, pertaining to the preparation and review of affidavits and warrants for arrests, searches, seizures . . ." and confers "immun[ity] from liability" under state law. Colo. Rev. Stat. § 20-1-106.1. As the district court correctly noted, however, a state statute—even one requiring affirmative action—cannot create immunity from a federal civil rights claim where

-35-

the functional analysis suggests otherwise. *Howlett v. Rose*, 496 U.S. 356, 375–76 (1990). And under the Supreme Court's functional analysis we look to what the attorney did—she provided legal advice—and not to what state law requires.

For the foregoing reasons, we conclude the district court erred in dismissing Mink's damages claim on the ground that it was barred by the doctrine of absolute immunity. The deputy district attorney, however, may be entitled to qualified immunity if she reasonably concluded probable cause existed to support the warrant application, or that the application of the Supreme Court's First Amendment cases to the criminal libel statute was not clearly established under the circumstances here.

The district court did not address the application of qualified immunity in these circumstances, and we decline to do so in the first instance. Accordingly, we remand that issue to the district court.

## IV. Conclusion

We AFFIRM the district court's dismissal of Mink's claims for declaratory relief and for damages under the Privacy Protection Act. We REVERSE the district court's decision to dismiss Mink's claim for damages based on absolute prosecutorial immunity, and REMAND for consideration of the district attorney's claim for qualified immunity.